**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:24-cv-03512-STV

C.C., a minor, by and through her parent and next
friend KRISTEN CROOKSHANKS,

E.S., a minor, by and through his parent and next
friend MINDY SMITH,

NAACP – COLORADO – MONTANA –
WYOMING STATE AREA CONFERENCE ("NAACP"),

THE AUTHORS GUILD,

     Plaintiffs,

v.

ELIZABETH SCHOOL DISTRICT,

     Defendant.

---

### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs C.C. by and through her parent and next friend KRISTEN CROOKSHANKS, E.S. by and through his parent and next friend MINDY SMITH, NAACP – COLORADO – MONTANA – WYOMING STATE AREA CONFERENCE ("NAACP"), and THE AUTHORS GUILD hereby move for a preliminary injunction as set forth below:

Defendant Elizabeth School District ("the District"), by and through its Board of Education ("the Board"), has removed at least nineteen books from school libraries in the District because of the Board's disagreement with the ideas contained in the books. The District

is poised to continue removing books from school libraries based on narrowly partisan and political motives. Plaintiffs seek a preliminary injunction to protect students' right to receive information and ideas, as well as authors' right to share their books free from undue viewpoint-based discrimination, as guaranteed under the First Amendment of the U.S. Constitution and Article II, section 10 of the Colorado Constitution. The District removed these books in order to prevent students in Elizabeth from accessing information and ideas about racism, discrimination, and LGBTQ+ people, and to ban views that fall outside of the political orthodoxy that the Board seeks to impose in the District. Without a preliminary injunction requiring that the removed books be returned to ESD libraries, students will be unable to access books in their school libraries that question or challenge the Board's partisan, political ideals, and authors' speech will be censored in ESD because of the views they express.

Plaintiffs therefore respectfully ask this Court to issue a preliminary injunction requiring that the removed books be returned to Elizabeth School District ("ESD") libraries and enjoining the Board from continuing to remove books from ESD libraries because of their disagreement with the ideas contained in the books. As explained below, a preliminary injunction is warranted because (1) Plaintiffs are likely to succeed on the merits of their claims, (2) Plaintiffs will suffer irreparable injury absent an injunction, (3) Plaintiffs' injury is great, and preliminary relief will not harm Defendants, and (4) an injunction would serve the public interest.

## STATEMENT OF FACTS

### I.    Elizabeth School District

The Town of Elizabeth, located to the east of Colorado Springs in Elbert County, is a small, majority-conservative, majority-white community with two elementary and preschools,

one middle school, one high school, and a charter school. The Elizabeth School District is governed by a five-member Board.[1] The Board has made no secret of its intent to imbue ESD schools with their own brand of political conservatism. Recently, the Board has become increasingly militant about banishing viewpoints that fail to conform with the partisan, political orthodoxy that they seek to impose in ESD. One of the Board's most recent efforts in service of this mission was to identify books they believe to be "sensitive" in ESD libraries and remove supposed "highly sensitive" books from the libraries altogether.

## II.    Identifying and Removing "Sensitive" Books

On August 12, 2024, the Board voted to adopt Policy 9.7, which directs the Board Curriculum Review Committee ("BCRC") to develop a list of books in ESD libraries that contain so-called "sensitive" topics (the "Sensitive List"). Ex. 7, Policy 9.7 at 3-4. According to Policy 9.7, "special attention" should be given to books that contain "racism/discrimination," "religious viewpoints," "sexual content," "graphic violence," "profanity/obscenity," "drug or excessive alcohol use," or "ideations of self-harm or mental illness." Ex. 7, Policy 9.7 at 4. In order to develop the Sensitive List, the BCRC began by looking at online lists of books that had been banned or challenged elsewhere to see if those books were in ESD libraries.[2]

---

[1] The Board members are Rhonda Olsen (President), Heather Booth (Vice President), Mary Powell (Secretary), Mike Calahan (Treasurer) and Jonathan Waller (Assistant Secretary/Treasurer).

[2] August 12 Board meeting at 48:16 (https://www.youtube.com/live/MC9iw6vtX3o).

A book's inclusion on the Sensitive List means that, if a child tries to check it out, their parent(s) will automatically be notified. Parents can also prohibit their children from checking out all books on the Sensitive List.

The Board determined that some of the "sensitive" books that the BCRC identified were *so sensitive* that they should not be in ESD libraries at all. The Board decided to remove these books (the "Removed Books") from ESD libraries and display them in the Board's office so that community members could weigh in on whether they thought the books should be returned to ESD libraries and added to the Sensitive List or permanently removed from ESD libraries' collections. The Removed Books are:

- *The Hate U Give* by Angie Thomas;
- *Beloved* by Toni Morrison;
- *The Bluest Eye* by Toni Morrison;
- *The Kite Runner* by Khaled Hosseini;
- *You Should See Me in a Crown* by Leah Johnson;
- *#Pride: Championing LGBTQ Rights* by Rebecca Felix;
- *George* (now published and referred to as *Melissa*) by Alex Gino;
- *It's Your World—If You Don't Like It, Change It* by Mikki Halpin;
- *The Perks of Being a Wallflower* by Stephen Chbosky;
- *Thirteen Reasons Why* by Jay Asher;
- *Looking for Alaska* by John Green,
- *Nineteen Minutes* by Jodi Picoult;
- *Crank* by Ellen Hopkins;
- *Glass* by Ellen Hopkins;
- *Fallout* by Ellen Hopkins;
- *Identical* by Ellen Hopkins;
- *Burned* by Ellen Hopkins; and
- *Smoke* by Ellen Hopkins.

For roughly 25 days, the Removed Books were displayed in the Board's office, with passages that the Board found troubling marked so that parents could easily turn to the portions of the books that the Board disagreed with. The Board provided forms that parents could fill out

to indicate whether they thought each of the eighteen books should be "[r]eturned to the library and listed on the sensitive topic list" or "[r]emoved from the library collection." Ex. 8, Book Review Form. There was no option on the form to return the books to school libraries and leave them off the Sensitive List such that students could check them out like any other book in the library.

### III.    Permanent Removal Decision

The Board believes its mandate is to imbue its own brand of conservative politics in ESD schools. Ex. 9, Booth email (Aug. 4) at 2 ("conservative values are exactly what we are and plan to continue to bring into the district"); Ex. 10, Booth email (Aug. 19) ("As an elected official committed to conservative values for our children, I feel a strong obligation to honor the promises made during my campaign. Many parents in our community are concerned about the content of books available in schools and libraries. It is our responsibility to respect [parents'] concerns and uphold our campaign commitments to the majority."); Ex. 11, Booth email (Aug. 19) (same). Removing books that discuss LGBTQ+ and race-related topics—and that other conservative districts have banned—is one step in fulfilling that mandate.

In deciding whether to return any of the "temporarily suspended" books to ESD libraries, the Board made clear it would consider the community's feedback on the books. In discussing whether to return some of the Removed Books to ESD libraries, Vice President Booth said the Board's "constituents will not be happy about us returning any of these books," and "[t]hat is who we are beholden to." Ex. 12, Booth email (Sept. 7) at 1.

Indeed, many parents filled out forms indicating they wanted the books to be removed because the books did not align with their partisan, political viewpoints. For example, one parent

of a high school student wrote that *#Pride: Championing LGBTQ Rights* should be removed because "LGBTQ themes do not belong in our public schools," Ex. 13, Book Review Forms, p. 1 (Laura), and a middle school parent wrote that "Middle school students are too young to be exposed to the pride movement, same sex marriage, stonewall riots and pride parades," Ex. 13, Book Review Forms, p. 2 (Ken). A high school parent opined that Ellen Hopkins, whose books address topics from teen sexuality to drugs, is "disgusting," and recommended that all of her books be removed. Ex. 13, Book Review Forms, p. 3 (Lyra). Some parents wrote that *Melissa*/*George* should be removed because, according to them, it "is evil trans-ideology" that "has no place in any school," Ex. 13, Book Review Forms, p. 4 (David), or is "morally offensive," Ex. 13, Book Review Forms, p. 5 (Matt). One parent wrote that *It's Your World—If You Don't Like It, Change It* should be removed because the "Women's Rights chapter supports abortion and equates it with healthcare when it is the murder of a human life," and the book contains an example letter that "encourages the reader to oppose parental notification laws which is exactly what our ESD board is trying to put in place." Ex. 13, Book Review Forms, p. 6 (Maryrose).

One high school parent said of Toni Morrison's *The Bluest Eye* that it should be removed because "no one should read this," and noted it contains rape, incest, and sex. Ex. 13 Book Review Forms, p. 7 (David). One parent advocated for the removal of "The Hate U Give," writing that it has "themes of anti-police, anti-white, pro BLM/riots and gang activity," Ex. 13, Book Review Forms, p. 8 (Maryrose), and another wrote that the book should be removed because it allegedly contains "police viewed in a bad light," Ex. 13, Book Review Forms, p. 9 (Ken). A middle school parent wrote that *You Should See Me in a Crown* should be removed

"because of it's [sic] CRT undertones and homosexual storyline." Ex. 13, Book Review Forms, p. 10 (Maryrose). Other parents voted for its removal because of a "DEI Pride flag" and the "Lesbian romance mentioned," Ex. 13, Book Review Forms, p. 11 (Shelly), or the "queer factor" and the fact that "the unrealistic aspects of this book give young people ideas that are unlikely at best," Ex. 13, Book Review Forms, p. 12 (Tracy). One parent claimed that *The Kite Runner* is "very racially divisive" and has "LGBTQ themes that do not belong in school." Ex. 13, Book Review Forms, p. 13 (Laura). She also wrote that she does "not want [her] teens reading a book that criticizes Christianity." *Id.*[3]

Board members echoed many of these same sentiments in their discussions of the Removed Books. For example, when Secretary Powell suggested that *#Pride: Championing LGBTQ Rights* and *You Should See Me in a Crown* be returned to ESD libraries, Vice President Booth vehemently disagreed, saying "LGBTQ is only regarding sexual preference which doesn't belong in any school." Ex. 12, Booth email (Sept. 7) at 1. President Olsen made the point to Secretary Powell that, if a book has "gender identity ideology" then the Board should not put it "out there at all." Ex. 14, Powell email (Sept. 8). Secretary Powell was convinced by their points and ultimately voted—along with all of her fellow Board members—to permanently banish both books from ESD libraries. Ex. 12, Booth email (Sept. 7) at 1.

Additionally, Vice President Booth, after reading aloud isolated passages from *Melissa/George* about the main character's discomfort with her body and ideas about boys

---

[3] The parent identified no portion of *The Kite Runner* that criticizes Christianity, and counsel for Plaintiffs, upon reading the book, also identified none.

becoming girls remarked, "this is disgusting."[4] Similarly, Assistant Secretary/Treasurer Waller,

after reading two out-of-context passages from *The Bluest Eye* that discuss sexual pleasure,

stated "I find this absolutely disgusting for kids to be reading in school."[5] President Olsen agreed

"it's disgusting," and added that she doesn't know if any kid would read better after engaging

with Toni Morrison's novel, but even if they did, she "wouldn't care."[6]

Unlike the Board members, many parents who filled out the Board's forms advocating

for books to be returned to school libraries focused on the educational value of the Removed

Books and a desire for students to be exposed to a broad range of ideas and viewpoints. For

example, one parent wrote "Books are a gift – they help us understand, process, confront,

empathize; they let us 'walk a mile' in others' shoes; they validate our feelings and help us feel

not so alone; they give us tools and the names for problems and emotions," and "[b]anning these

books because the subjects are difficult or the content graphic is short-sighted and misguided."

Ex. 13, Book Review Forms, p. 14 (Mindy). Another form expressed that "[w]e do our children a

dis-service if we sugar-coat and cherry-pick literary material that could broaden their minds to

others' experiences, leading to a more compassionate state of being," Ex. 13, Book Review

Forms , p. 15 (Wendy).

Some forms noted the educational value of individual authors or books, explaining, for

example, that "Toni Morrison is an internationally acclaimed and beloved chronicler of African

---

[4] Aug. 26 Board meeting at 1:19:42 (https://www.youtube.com/watch?v=lALFn6EY9-8).

[5] *Id*. at 1:26:25.

[6] *Id.* at 1:26:37.

American history," and suppressing ideas does not get rid of atrocities that happened, Ex.13,

Book Review Forms, p. 17 (Kathy) or that "John Green is celebrated for his portrayals of modern

teen life" and *Looking for Alaska* can help teens "find a place for themselves," Ex. 13, Book

Review Forms, p. 18 (Kathy). One form notes that *Crank* should not be returned to the Elizabeth

High School library because it is "a great pick for reluctant readers" because it is written in verse

and can serve as a cautionary tale. Ex. 13, Book Review Forms, p. 19 (Kathy). Another notes

that *The Hate U Give* is a "sympathetic portrayal of a girl and her family dealing with fear and

horror resulting from a violent encounter she never expected." Ex. 13 Book Review Forms, p. 20

(Kathy). And another notes that *You Should See Me in a Crown* is, according to 2020 Goodreads,

"a self-love anthem for queer black girls everywhere." Ex. 13 Book Review Forms, p. 21

(Mindy).

      Some parents also opposed the Board's decision to remove books from school libraries

because of the stigmatizing messages the Board was sending, noting, for instance, that the list of

removed books "is not welcoming to anyone who is not white, straight and politically

conservative," Ex. 13 Book Review Forms, p. 22 (Kathy).

      Some parents even modified the options provided by the Board on the form and indicated

that they wanted the books returned to the library and did *not* want to be notified when their

children checked out the books, because "Book Banning is unconstitutional," Ex. 13, Book

Review Forms, p. 23 (Christine), because high school students "will encounter all the

ideas/verbiage/violence at some time," Ex. 13, Book Review Forms, p. 24 (Janet), or because

some parents "much prefer [their] child can explore these subjects in an educational institution

then [sic] from hearsay, whispers, gossip and their fellow pears without the hope of open discussion and psychological safety," Ex. 13 Book Review Forms, p. 25 (Mindy).

But because Board members found the eighteen "temporarily suspended" books "disgusting," and out of line with the so-called "conservative values" they intended to promote in ESD, they determined that all eighteen books would be permanently banished from school libraries. The District has also made clear that they may continue to remove books from ESD libraries based on the ideas they contain. Ex. 15, Snowberger email (Aug. 19).

## IV.    Additional Ad Hoc Book Removal

The District has also removed at least one other book from ESD libraries. On September 5, 2024, a parent emailed President Olsen complaining about a book from the library at Running Creek Elementary, *Redwood and Ponytail* by K.A. Holt. Ex. 16, Olsen email (Sept. 5). The parent complained about the book because it includes two girls who develop strong feelings for each other. Less than an hour after receiving the complaint, President Olsen responded to the parent saying she would have the book removed. *Id*. Because the Board sought to remove any books that acknowledge LGBTQ+ identities, it removed *Redwood and Ponytail* from the Running Creek elementary library.

## V.    Plaintiffs Harmed by Removal of School Library Books

Plaintiffs in this case include ESD students who intended to browse and/or check out the Removed Books from their school libraries but have not been able to do so since the Board removed them. Plaintiff C.C. is an eleventh-grade student at Elizabeth High School who spends much of her free time reading. Ex. 1, C.C. Decl. at ¶¶ 2–3. She regularly spends time in her school library and enjoys browsing the library shelves to discover interesting books to read. Ex.

1, C.C. Decl. at ¶¶ 13–14. She is interested in browsing and/or checking out the Removed Books from her school library, but now, when C.C. browses her school library, she is "only . . . able to find books that fit the school board members' worldview." Ex. 1, C.C. Decl. at ¶¶ 10-12, 15. She experiences the Board's removal of books from her school library as an impediment to her ability to "access[] information about a wide variety of topics and views." Ex, 1, C.C. Decl. at ¶ 16. C.C. was brought to tears by the District's decision to remove books from her school library, both because she could no longer browse or check out the Removed Books, and because "it was so clear that they were targeting LGBTQ people" like her. Ex. 1, C.C. Decl. at ¶¶ 7–8; Ex. 2, Crookshanks Decl. at ¶ 9; *see also* Ex. 1, C.C. Decl. at ¶ 8 ("When a book like #*Pride: Championing LGBTQ Rights* is selected to be banned from school libraries, it tells me that the people responsible for my education don't want us to be gay, and they don't want us to learn about LGBTQ history or LGBTQ people.").

Plaintiff E.S. is in preschool at Running Creek Elementary and uses the school's library to choose books. Ex. 3, Smith Decl. at ¶¶ 2-5. His parents intend for E.S. and his younger sister to attend elementary, middle school and high school in the Elizabeth School District. *Id.* It is important to E.S.'s parents that throughout E.S.'s education he has access to a diverse array of books where he can learn about difficult subjects and different viewpoints. Ex. 3, Smith Decl. at ¶¶ 6-8. They are also concerned that the District's actions are sending a message that it is not okay to learn about race and racism in America and that stigmatizes LGBTQ+ identities. Ex. 3, Smith Decl. at ¶¶ 10-15.

Plaintiff NAACP has members who are parents of students in the Elizabeth School District who use their school library to discover new information and explore a wide array of

ideas and viewpoints. Ex. 4, Prescott Decl. at ¶ 8; Like C.C., they intended to use their school library to access information about race, racism, LGBTQ history and identity, and other topics that are important to them.  Ex. 4, Prescott Decl. at ¶ 8.  Now, they are prevented or chilled from reading the Removed Books and discussing any ideas that fall outside the Board's partisan, political orthodoxy. Ex. 4, Prescott Decl. at ¶ 7.  Plaintiff NAACP also has members who are parents of students in ESD who want their children to have access to all of the books that have been removed from their school libraries. Ex. 2, Crookshanks Decl. at ¶ 10; Ex. 3, Smith Decl. at ¶¶ 18-20.

Plaintiff the Authors Guild ("Guild") includes authors whose books were removed from ESD libraries because of the viewpoints expressed therein. Guild member Ellen Hopkins wrote *Crank*, *Glass*, *Fallout*, *Identical*, *Burned*, and *Smoke* to help teenagers navigate difficult situations and express her views on the perils and realities of addiction, abuse, and promiscuity. Ex. 5, Hopkins Decl. at ¶¶ 1, 7-13. Guild member Angie Thomas wrote *The Hate U Give* to express her views on racism, police misconduct, and the value of teenagers using their voices to advocate for people and causes they care about. Guild member Alex Gino wrote *George* (now published and referred to as *Melissa*) which offers an authentic portrayal of a child navigating gender identity while addressing themes of courage, self-discovery, acceptance, and friendship. Ex. 6, Gino Decl. at ¶¶ 4. Guild member John Green wrote *Looking for Alaska* to express his views on loss, grief, and intimacy, and to share his views with teenagers who may be experiencing death and grief for the first time. Guild member Jodi Picoult wrote *Nineteen Minutes* to help young adults feel seen and express her views on the consequences of teasing and failing to stand up against bullying. Because the Board disagrees with these authors' viewpoints

12

and worldviews, the authors can no longer share them with ESD students. Ex. 5, Hopkins Decl.

at ¶ 19; Ex. 6, Gino Decl. at ¶ 7.

Unless this Court grants injunctive relief, students will continue to be denied access to

information and ideas in a narrowly partisan and political manner, and authors will continue to

be censored in a viewpoint-discriminatory manner.

## **LEGAL STANDARD**

"District courts have discretion over whether to grant preliminary injunctions." *Free the

Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 796 (10th Cir.2019). To

obtain a preliminary injunction, Plaintiffs must show "(1) a substantial likelihood of prevailing

on the merits; (2) irreparable harm unless the injunction is issued; (3) [that] the threatened injury

outweighs the harm that the preliminary injunction may cause the opposing party; and (4) [that]

the injunction, if issued, will not adversely affect the public interest." *Greater Yellowstone Coal.

v. Flowers*, 321 F.3d 1250, 1255 (10th Cir.2003) (quoting *Fed. Lands Legal Consortium ex rel.

Robart Estate v. United States,* 195 F.3d 1190, 1194 (10th Cir.1999)). All factors are satisfied

here.

Plaintiffs seek a preliminary injunction in order to preserve the status quo—when all of

the Removed Books were available in ESD libraries. Because this Motion merely seeks to return

those books to ESD libraries, "the preliminary injunction in this case does not require

defendant[] to do something that they were not doing during the last uncontested period." *Evans

v. Fogarty*, 44 Fed.Appx. at 928 (10th Cir. 2002).

## ARGUMENT

**I.        Plaintiffs Are Likely to Succeed on the Merits of Their Claims.**

Plaintiffs are likely to succeed on the merits of their claims asserting violations of the

First Amendment of the United States Constitution and Article II, section 10 of the Colorado

Constitution. To demonstrate a likelihood of success on the merits, Plaintiffs must "present 'a

prima facie case showing a reasonable probability that [they] will ultimately be entitled to the

relief sought.'" *Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1100 (10th

Cir.2003) (quoting *Autoskill v. Nat'l Educ. Support Sys.,* 994 F.2d 1476, 1487 (10th Cir.1993)).

This burden is lower than showing an "overwhelming" likelihood of success, or "positively"

establishing a right to relief on the merits. *Atchison, Topeka and Santa Fe Ry. Co. v. Lennen*, 640

F.2d 255, 261 (10th Cir.1981). And where, as here, the three "harm" factors tip "decidedly" in

the moving party's favor, the "probability of success requirement" is relaxed further; the moving

party "need only show questions going to the merits so serious, substantial, difficult and

doubtful, as to make them a fair ground for litigation." *Heidemann v. S. Salt Lake City*, 348 F.3d

1182, 1189 (10th Cir.2003) (internal quotation marks omitted). Plaintiffs more than satisfy this

burden.

**A.        The District Violated Students' Constitutional Right to Access Information
and Ideas in School Libraries.**

**1.        Students' Interest in Accessing Books in Their School
Libraries Is Constitutionally Protected.**

The First Amendment of the U.S. Constitution and Article II, section 10 of the Colorado

Constitution protect the right to receive information and ideas. *Stanley v. Georgia*, 394 U.S. 557,

564 (1969); *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1051 (Colo. 2002). And

"[t]he vigilant protection of constitutional rights is 'nowhere more vital' than in our schools and universities." *Tinker*, 393 U.S. at 512 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). "In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Id.* at 511.

This is particularly true in the school library, which is the "principal locus" of students' freedom "to inquire, to study and to evaluate, [and] to gain new maturity and understanding.'" *Pico*, 457 U.S. at 869 (Opinion of Brennan, Marshall, and Stevens) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967)). The school library is meant to serve as "a mirror of the human race, a repository of the works of scientists, leaders, and philosophers." *Roberts v. Madigan*, 702 F. Supp. 1505, 1512–13 (D. Colo. 1989), *aff'd,* 921 F.2d 1047 (10th Cir.1990); *see also Right To Read Def. Comm. of Chelsea v. Sch. Comm. of City of Chelsea*, 454 F. Supp. 703, 715 (D. Mass. 1978) ("The student who discovers the magic of the library is on the way to a life-long experience of self-education and enrichment. That student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom.").

To be sure, school districts have broad discretion over certain *curricular* matters. But school library books are not part of the mandatory curriculum; no student is required to read every book in the library. Instead, school libraries are "valuable adjunct[s] to classroom discussion." *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir.1976). Students' "selection of books from these libraries is entirely a matter of free choice; the libraries afford them an opportunity at self-education and individual enrichment that is wholly optional." *Pico*, 457 U.S. at 869. In this noncurricular space, students' First Amendment and Article II, section 10 rights are at their pinnacle. *See id.* at 868 ("[T]he special characteristics of the

15

school *library* make that environment especially appropriate for the recognition of the First

Amendment rights of students.").

> 2.      The District's Removal of Books From ESD Libraries
> Violated Students' Constitutional Right to Receive
> Information and Ideas.

While the District "possess[es] legitimate power to protect children from harm, . . . that

does not include a free-floating power to restrict the ideas to which children may be exposed."

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (internal citations omitted). The

Supreme Court considered the constitutionality of a school district's removal of books from

school libraries in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*,

457 U.S. 853 (1982). The facts of *Pico* are remarkably similar to the facts here. In *Pico*, parents

in a New York school district obtained a list of "objectionable" books at a conservative

conference about education legislation. *Id.* at 856. Some of the listed books were in the school

district's libraries, so the school board directed that the books be removed from school library

shelves and delivered to the board members for them to read.  *Id.* at 857. The Board ultimately

determined that all but one of the books should be banned from school libraries.

A plurality of the U.S. Supreme Court held that "local school boards may not remove

books from school library shelves simply because they dislike the ideas contained in those books

and seek by their removal to 'prescribe what shall be orthodox in politic, nationalism, religion, or

other matters of opinion.'" *Pico*, 457 U.S. at 872 (Opinion of Brennan, Marshall, Stevens, and

Blackmun)) (quoting *Barnette*, 319 U.S. at 642). In explaining its decision, the plurality provided

two examples of acts that would undoubtedly violate the First Amendment. First, "[i]f a

Democratic school board, motivated by party affiliation, ordered the removal of all books written

by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students denied access to those books." *Id.* at 870–71. Second, "[t]he same conclusion would surely apply if an all-white school board, motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration." *Id.* at 871. From past precedent, the plurality gleaned the rule that school boards cannot constitutionally exercise their discretion to determine the content of school libraries "in a narrowly partisan or political manner." *Id.* at 870.

Indeed, the notion that "[o]ur Constitution does not permit the official suppression of ideas," *id.* at 871, was well established before *Pico* and continues to be after. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"); *West Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Courts across the country have followed these principles in holding the removal of controversial books from school libraries unconstitutional. *See, e.g.*, *Case v. Unified School Dist. No. 233*, 908 F.Supp. 864 (D. Kan. 1995) (granting injunction to restore to school library a book about a romantic relationship between teenage girls); *Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 693 (D. Me. 1982) (students and parents were entitled to preliminary injunction restoring *365 Days* to high school library after it was removed for having objectionable language); *Right To Read Def. Comm. of Chelsea v. Sch. Comm. of City of Chelsea*, 454 F. Supp. 703, 715 (D. Mass. 1978) (enjoining removal of anthology from high school library where school committee found its theme and language offensive); *Salvail v. Nashua Bd. of Ed.*, 469 F.

17

Supp. 1269, 1272, 1275 (D.N.H. 1979) (enjoining removal of magazine from high school library where it contained advertisements for vibrators, contraceptives, "gay material," and a "pro-communist newspaper" but also had "obvious research value"); *Minarcini v. Strongsville City School District*, 541 F.2d 577, 582 (6th Cir.1976) (Board's removal of books from school library, in absence of any neutral explanation, violated First Amendment); *see also Parnell v. Sch. Bd. of Lake Cnty., Fla.*, No. 4:23-CV-414-AW-MAF, 2024 WL 2703762, at *26 (N.D. Fla. Apr. 25, 2024) (Plaintiffs stated plausible claim that removing a book about two male penguins raising a baby penguin violated First Amendment); *PEN American Center, Inc. v. Escambia County School Board*, No. 3:23-CV-10385-TKW-ZCB, 2024 WL 133213, at *2 (N.D. Fla. Jan. 12, 2024) (Plaintiffs stated plausible claim that Board's removal of books from high school library violated First Amendment); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1005 (W.D. Ark. 2003) (District violated First Amendment when it moved Harry Potter books from school library's normal shelves to special area for students who have signed permission statement from parent); *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189 (5th Cir.1995) (remanding for further development of the record but also observing that "in light of the special role of the school library as a place where students may freely and voluntarily explore diverse topics, the School Board's non-curricular decision to remove a book well after it had been placed in the public school libraries evokes the question whether that action might not be an unconstitutional attempt to 'strangle the free mind at its source.'" (quoting *Barnette*, 319 U.S. at 637)).

Here, the Board did—and continues to—remove books because of the ideas they contain. Policy 9.7 itself singles out the particular ideas that the Board takes issue with:

"racism/discrimination," "religious viewpoints," "sexual content," "graphic violence," "profanity/obscenity," "drug or excessive alcohol use," and "ideations of self-harm or mental illness." Ex. 7, Policy 9.7 at 4. And in discussing the books to be removed, the Board members made clear their disdain for the ideas contained therein. Vice President Booth stated that books about LGBTQ people should not be returned to school libraries because "LGBTQ is only regarding sexual preference which doesn't belong in any school." Ex. 12, Booth email (Sept. 7) at 1. President Olsen suggested that if a book has "gender identity ideology" then it should not be "out there at all." Ex. 14, Powell email (Sept. 8).

Secretary Powell also stated that students "don't need to see an ugly story just for the sake of being an ugly story."[7] The Board publicly expressed its disdain for the Removed Books, referring to books like *The Bluest Eye* and *Melissa*/*George* as "disgusting."[8] Secretary/Treasurer Waller, after reading two out-of-context passages from *The Bluest Eye* that discuss sexual pleasure and stating that he finds the book "absolutely disgusting for kids to be reading in school,"[9] President Olsen agreed "it's disgusting," and added that she doesn't know if any kid would read better after engaging with Toni Morrison's novel, but even if they did, she "wouldn't care."[10]

---

[7] Aug. 12 Board meeting at 1:01:01 (https://www.youtube.com/live/MC9iw6vtX3o).

[8] Aug. 26 Board meeting at 1:19:42 (https://www.youtube.com/watch?v=lALFn6EY9-8).

[9] *Id.* at 1:26:25.

[10] *Id.* at 1:26:37.

These comments make clear not only that the Board's removal of books is unconstitutional under *Pico*, but also that the Board's actions would fail any lesser standard of scrutiny as well. Under *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), "[s]chools may restrict student speech only if it 'would substantially interfere with the work of the school or impinge upon the rights of other students'" or if the school "reasonably forecasts such disruption." *C1.G on behalf of C.G. v. Siegfried*, 38 F.4th 1270, 1276 (10th Cir.2022) (quoting *Tinker*, 393 U.S. at 509). "Officials may not restrict speech based on 'undifferentiated fear or apprehension of disturbance' or a 'mere desire to avoid the discomfort and unpleasantness that always accompany [an] unpopular viewpoint.'" *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 37 (10th Cir.2013) (quoting *Tinker*, 393 U.S. at 508–09).

Here, there was no "concrete threat" that the Removed Books would cause "substantial disruption." *Id.* (quoting *Sypniewski v. Warren Hills Regional Bd. of Educ.,* 307 F.3d 243, 262 (3rd Cir.2002)). Indeed, Vice President Booth stated publicly, while discussing the Board's decisions with respect to its new library protocols, that "[w]e don't always put things in place . . . because it's happening right now in our schools right now. We put things in place so as new people come in, as new things happen, we have up guardrails to protect our students."[11] The vague notion that books containing ideas with which Board members disagree might at some point make "new things happen" in Elizabeth schools does not justify removing them. *See Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1004 (W.D. Ark. 2003) ("speculative

---

[11] Aug. 26 Board meeting at 1:46:36 (https://www.youtube.com/watch?v=lALFn6EY9-8).

apprehensions of possible disturbance are not sufficient to justify the extreme sanction of restricting the free exercise of First Amendment rights in a public school library"). While such books might engender discussion or spirited debate by those who read them, "*Tinker* rejected the idea that a 'silent, passive' expression that merely provokes discussion in the hallway constitutes such a threat, particularly if that expression is political." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 37 (10th Cir.2013) (quoting *Tinker*, 393 U.S. at 514).

All Board members ultimately voted not to return any of the Removed Books to ESD libraries because each book contained LGBTQ characters, expressed views on race that the Board members disagree with, or otherwise failed to align with the Board's brand of "conservative values." Ex. 9, Booth email string (Aug. 4). Under any standard, by depriving students of access to books that fail to conform with the Board's partisan, political orthodoxy, the District violated students' right to receive information under the First Amendment and Article II, section 10.

**B.    The District Violated Authors' Constitutional Right to Share Their Books Free From Undue Viewpoint-based Censorship.**

Books are authors' tools to share their own viewpoints and ideas with their intended audiences. Ex. 5 Hopkins Decl. at ¶¶ 8-9, 13-14, 19; Ex. 6, Gino Decl. at ¶¶ 6, 8. Authors' right to share their books is protected under the First Amendment. *See Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943) (The First Amendment "embraces the right to distribute literature."); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 (1963) (The First Amendment "embraces the circulation of books").

The First Amendment's "bedrock principle" is that the "government may not prohibit the expression of an idea simply because society finds [the] idea itself offensive or disagreeable."

*Texas v. Johnson*, 491 U.S. 397, 414 (1989). Thus, in most contexts, viewpoint-based discrimination is "presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 828-29 (1995). But even if a lesser standard were to apply in the context of permitting authors' expression to remain in school libraries, the District could not satisfy it. For example, even if the Court treated ESD libraries as nonpublic fora, the Board could not constitutionally restrict access to books unless their restrictions were "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985) (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983)). Here, the Board's removal of books from ESD libraries was not "reasonable in light of the purpose of the property," *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682 (1998), because school libraries are designed to "mirror . . . the human race" and offer students "a range of knowledge," *Roberts v. Madigan*, 702 F. Supp. 1505, 1512–13 (D. Colo. 1989), *aff'd,* 921 F.2d 1047 (10th Cir.1990) —not to mirror the Board's preferred viewpoints and circumscribe the available knowledge to that which fits into the Board's prescribed political orthodoxy. Even if the authors' views are "unpopular or out of the mainstream," and even if there is "political pressure" to remove books and ideas that community members dislike, the Board must still act with viewpoint neutrality. *Forbes*, 523 U.S. at 683.

Moreover, as discussed above, because the District's removal decisions were based on no more than a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," the District could not satisfy the standard under *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969). And because the District's removal decisions

were not motivated by a legitimate pedagogical purpose, the District could not satisfy the standard for restrictions on curricular speech, *see Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 273 (1988); *see also Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292–93 (10th Cir.2004) ("we would be abdicating our judicial duty if we failed to investigate whether the educational goal or pedagogical concern was *pretextual*").

The Board's attempt to absolve itself of responsibility for its viewpoint-based censorship by soliciting community input on whether the books should be permanently banished from ESD libraries must fail. Vice President Booth stated that the Board was instituting its new book protocols because the current Board members were elected "on these values to keep your (the majority) values in mind of this community, and that is what we are going to do."[12] To be sure, some Elizabeth parents expressed their agreement with the Board that the Removed Books are "disgusting" because they acknowledge LGBTQ identities or offer minority perspectives.

But the Board cannot put the majority's desires above the Constitution's guarantees. Indeed, "the framers enshrined the right to free speech into the Constitution because they 'recogniz[ed] the occasional tyrannies of governing majorities.'" *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (quoting Whitney v. California, 274 U.S. 357, 375—376 (1927) (Brandeis, J., concurring)). "[T]he fact that an idea may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000). And the First Amendment prohibits the government from enacting a "heckler's veto," censoring

---

[12] Aug. 26 Board meeting at 1:49:00 (https://www.youtube.com/watch?v=lALFn6EY9-8).

speech "simply because it might offend a hostile mob." *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 135, 140 (1992); *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir.1989) ("The Supreme Court has squarely rejected what it refers to as the 'heckler's veto' as a justification for curtailing 'offensive' speech in order to prevent public disorder."); *see also Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 549 (N.D. Tex. 2000) (holding unconstitutional a resolution that allowed library card holders to petition to remove books from the children's area to the adult's area of the library, in part because it permitted complaining patrons "to veto lawful, fully-protected expression simply because of their adverse reaction to it").

While a parent might believe that certain library books are disgusting or should not be read by children, if an author's "message does not fall into one of the recognized categories of unprotected speech, the message does not lose its protection under the First Amendment due to the lawless reaction of those who hear it." *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 252 (6th Cir.2015). "Any other rule would effectively empower a majority to silence dissidents simply as a matter of personal predilections and the government might be inclined to regulate offensive speech as a convenient guise for banning the expression of unpopular views." *Id.* at 243 (quotations and citations omitted).

Thus, even if the Board correctly divined that the majority of ESD parents vehemently support police decisions to use force and disagree with any notion that anti-Black racism persists in modern society, they could not constitutionally remove *The Hate U Give* and other books addressing racism from ESD libraries simply because they express such views. Even if most ESD parents sincerely believed that teenagers should never question their sexuality or develop

24

romantic feelings for people of the same gender, the Board could not constitutionally remove all ESD students' access to *#Pride: Championing LGBTQ Rights* and other books that discuss the issue simply because the books express the viewpoint that LGBTQ identities are real and/or are not shameful.

Thus, under any standard, the Board's removal of books from ESD libraries because of its disagreement with the viewpoints expressed therein violates Guild member authors' First Amendment rights. Such viewpoint-based censorship likewise violates Article II, section 10 of the Colorado Constitution, which "provides greater protection of free speech than does the First Amendment." *Lewis v. Colorado Rockies Baseball Club, Ltd.*, 941 P.2d 266, 271 (Colo. 1997).

## II.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief.

Where, as here, Plaintiffs' First Amendment rights are implicated, there is a presumption of sufficient irreparable injury to warrant preliminary injunctive relief. *Cmty. Commc'ns Co., Inc. v. City of Boulder*, 660 F.2d 1370, 1376 (10th Cir.1981). "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir.2016) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). Indeed, "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir.2012) (quoting *Kikumura v. Hurley,* 242 F.3d 950, 963 (10th Cir.2001)).

No amount of monetary relief could fully compensate students for their inability to access books presenting controversial topics and viewpoints in the school library from August 2024 to present. *See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir.2001) ("A plaintiff suffers irreparable injury when the court would be unable to grant

an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain."). Even if some students are able to find the removed books in other locations, the restriction on their right to access them in the school library—based on the Board's disagreement with the ideas they contain—still constitutes irreparable injury. *See Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 163 (1939) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place"); *Minarcini*, 541 F.2d at 582 ("Restraint on expression may not generally be justified by the fact that there may be other times, places, or circumstances available for such expression."); *Case*, 908 F. Supp. at 876 ("The availability of *Annie on My Mind* from other sources does not cure defendants' improper motivation for removing the book.").

Student C.C. and NAACP members' children are injured both by the loss of access to the Removed Books in the school library, and by the stigma that Defendants' actions have placed on the Removed Books and the ideas they contain. *See Counts v. Cedarville School District*, 295 F. Supp. 2d 996, 1002 (W.D. Ark. 2003) (holding that requiring parental permission to check out Harry Potter books violated students' First Amendment rights in part because "the stigmatizing effect of having to have parental permission to check out a book constitutes a restriction on access"); *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 779 (8th Cir.1982) ("The symbolic effect of removing [material from schools] is more significant than the resulting limitation of access to the story."). C.C. experiences Elizabeth as an "openly homophobic place," and as a queer teenager, it is important for her to have easy access to books about LGBTQ people who are accepted and proud. Ex. 1, C.C. Decl. ¶ 9; Ex. 2, Crookshanks Decl. ¶¶ 10–13. And unless and until the Removed Books are restored to ESD libraries, C.C. and

the children of NAACP's members will be restricted from reading books that interest them and that have educational value for them. Ex. 1, C.C. Decl. ¶¶ 10–12.

Guild member authors are similarly suffering irreparable injury absent an injunction barring the District from removing their books from school libraries because of the viewpoints they express. Ex. 5, Hopkins Decl. at ¶¶ 17-19; Ex. 6, Gino Decl. at ¶¶ 9-10. And ESD librarians have already been directed not to order any more library books so as to avoid including any objectionable viewpoints in ESD libraries. *See* Ex. 17, Moore email (Sept. 6); Ex. 18, Moore email (Sept. 10).

Moreover, the Board has made clear that the process of reviewing and removing books is ongoing. Without an injunction ordering Defendants to cease removing books from the school library based on their disagreement with the topics and views expressed in those books, the District will continue to deprive students of access to an unknown number of books and ideas and to deprive authors of the ability to share their views with those students. The removal of books from ESD libraries has already caused Plaintiffs irreparable injury and will continue to do so if not enjoined.[13] *See, e.g.*, Ex. 15, Snowberger email (Aug. 19) ("Books on [the evolving Sensitive List] could also be removed based on further discussion between members of the community and the Board of Education"); Ex. 1, C.C. Decl. ¶ 19 ("I worry that the District will continue to remove books from my school library if they find out the books acknowledge LGBTQ identities or discuss topics like racism").

---

[13] Aug. 26 Board meeting at 1:30:00 (https://www.youtube.com/watch?v=lALFn6EY9-8).

III.    **The Harm to Plaintiffs Outweighs Any Harm to Defendants.**

"[W]hen [a] plaintiff is claiming the loss of a constitutional right, courts commonly rule that even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue." 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.2. Here, the District's removal of books from ESD libraries heavily burdens Plaintiffs' First Amendment rights—a burden that constitutes irreparable injury as a matter of law.

On the other side of the balance, restoring books to school library shelves will cause no injury to the District. If Board members prefer not to read the Removed Books, and if some of their constituents prefer not to read the Removed Books, they can simply choose not read the Removed Books. Allowing *others* to read those books causes them no harm. *See Sheck v. Baileyville Sch. Committee*, 530 F.Supp. 679, 684 (D. Me. 1982) (Defendants failed to show that restoring *365 Days* to the school library pending decision on merits of Plaintiffs' First Amendment claims would cause them comparable injury to Plaintiffs); *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 551 (N.D. Tex. 2000) ("Where First Amendment rights are concerned, those seeking to restrict access to information should be forced to take affirmative steps to shield themselves from unwanted materials; the onus should not be on the general public to overcome barriers to their access to fully-protected information.").

IV.    **Injunctive relief serves the public interest**

"[A]s far as the public interest is concerned, it is axiomatic that the preservation of First Amendment rights serves everyone's best interest." *Local Org. Comm., Denver Chapter, Million Man March v. Cook*, 922 F. Supp. 1494, 1501 (D. Colo. 1996). Indeed, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670

F.3d 1111, 1132 (10th Cir.2012).

Moreover, allowing Elizabeth students to read freely and expose themselves to new ideas benefits everyone. Whether or not students agree with various authors' viewpoints, identify with various types of characters, or even read the removed books at all, the availability of controversial ideas is critical to ensuring that school libraries remain the "mighty resource in the free marketplace of ideas" that they have always been. *Minarcini v. Strongsville City School Dist.*, 541 F.2d 577, 582 (6th Cir.1976).

## PLAINTIFFS SHOULD NOT BE REQUIRED TO POST SECURITY

Federal Rule of Civil Procedure 65(c) references "security in an amount that the [C]ourt considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Court may, in exercise of discretion, determine a bond is unnecessary to secure an injunction "if there is an absence of proof showing a likelihood of harm." *Coquina Oil Corp. v. Transwestern Pipeline Co.,* 825 F.2d 1461, 1462 (10th Cir.1987).

Here, for the reasons discussed, the District will not suffer any undue harm if the requested relief is granted. Instead, injunctive relief will preserve the status quo by restoring the parties to the "last peaceable position" existing between them before the dispute developed. *Dry Cleaning To-Your-Door, Inc. v. Waltham Ltd. Liab. Co.*, No. 07-CV-01483-WDM-MJW, 2007 WL 4557832, at *2 (D. Colo. Dec. 20, 2007). The last peaceable position was when the District had not yet begun unlawfully removing books from ESD libraries because they failed to conform with the Districts partisan, political orthodoxy. An injunction restoring the removed books and barring the District from continuing to remove library books with which they disagree will not affect the District's future interests. Accordingly, no bond should be required.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully ask this Court to grant a preliminary injunction prohibiting the Board and its agents, attorneys, servants, employees, and other representatives from removing books from ESD libraries because of the ideas contained in the books and requiring that they restore to ESD libraries *The Hate U Give* by Angie Thomas; *Beloved* by Toni Morrison; *The Bluest Eye* by Toni Morrison; *The Kite Runner* by Khaled Hosseini; *You Should See Me in a Crown* by Leah Johnson; *#Pride: Championing LGBTQ Rights* by Rebecca Felix; *Melissa/George* by Alex Gino; *It's Your World—If You Don't Like It, Change It* by Mikki Halpin; *The Perks of Being a Wallflower* by Stephen Chbosky; *Thirteen Reasons Why* by Jay Asher; *Looking for Alaska* by John Green, *Nineteen Minutes* by Jodi Picoult; *Crank*, *Glass*, *Fallout*, *Identical*, *Burned*, and *Smoke*, by Ellen Hopkins; and *Redwood and Ponytail* by K.A. Holt.

Dated:  December 20, 2024.                Respectfully submitted,

                                          s/ Craig R. May
                                          _____
                                          Craig R. May
                                          Thomas C. Dec
                                          Celyn D. Whitt
                                          Wheeler Trigg O'Donnell LLP
                                          370 Seventeenth Street, Suite 4500
                                          Denver, CO 80202
                                          Telephone:  303.244.1862
                                          Facsimile:   303.244.1879
                                          Email:  may@wtotrial.com
                                                  dec@wtotrial.com
                                                  whitt@wtotrial.com

                                          *In cooperation with American Civil Liberties Union Foundation of Colorado*

                                          Timothy R. Macdonald

Sara R. Neel
Laura Moraff
American Civil Liberties Foundation of Colorado
303 E. 17th Ave., Suite 350
Denver, CO 80203
Telephone:     720.402.3107
Email: tmacdonald@aclu-co.org
          sneel@aclu-co.org
          lmoraff@aclu-co.org

*Attorneys for Plaintiffs*

## **CERTIFICATE OF CONFERRAL**

On December 19, 2024, shortly after the Complaint was filed, counsel for Plaintiffs, Craig May, sent an email to Brad Miller of Miller Farmer Carlson Law, the attorney who has represented ESD in recent CORA requests related to the book ban, to confer on this motion. The email provided Mr. Miller with a copy of the filed Complaint and advised that Plaintiffs would soon be moving for a preliminary injunction – based on the same reasoning set out in the Complaint – to enjoin the existing book ban and any future book bans based on the District's disagreement with the ideas in a book. Mr. May asked that the District respond with its position and also asked Mr. Miller to notify him immediately if Mr. Miller was not representing the school in this matter.

On December 20, 2024, Bryce Carlson, Mr. Miller's law partner, emailed Mr. May a response. He indicated the district had just gone on holiday break and requested the motion not be filed until after the break to provide his firm with more of an opportunity to review the complaint with the District.

District Superintendent Dan Snowberger has made public statements about the lawsuit and has been quoted as saying that the District "intends to vigorously defend itself" in the lawsuit. https://www.cpr.org/2024/12/19/aclu-sues-elizabeth-school-district-over-book-ban/.

Additionally, in an email to all families in ESD sent today, Mr. Snowberger informed families about the lawsuit, and wrote:

> Yesterday, in cooperation with two parents in our community, the American Civil Liberty Union (ACLU) filed a legal claim against the district seeking to force Elizabeth School District to place these materials back into our school libraries. It is sad that some want to force their political agenda on the district and cause parents to worry about what their children might check out from school.

> …Know that we will vigorously defend our actions that protect students. For parents who wish to have their children access such materials, our public library is always available and such books can be purchased through other resources…

> Our board and I continue to stand behind your rights as parents to make important decisions about your children and will continue to use a common sense approach in selecting materials that are available in our schools. No one should have the right to take that away from you because their values may differ from yours.

Based on ESD's public statements, Plaintiffs are filing the above motion. Plaintiffs are amenable to agreeing to a reasonable extension of time should the District's counsel need it, in light of the upcoming holidays.

<u>**CERTIFICATE OF SERVICE (CM/ECF)**</u>

I HEREBY CERTIFY that on December 20, 2024, I electronically filed the foregoing **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Thomas C. Dec**
  dec@wtotrial.com, christman@wtotrial.com

- **Celyn D. Whitt**
  whitt@wtotrial.com, behunin@wtotrial.com


- **Timothy R. Macdonald**
  tmacdonald@aclu-co.org, mbailey@aclu-co.org, sneel@aclu-co.org


*s/ Craig R. May*