**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-03512-CNS-STV

KRISTEN CROOKSHANKS, as parent and next of friend of a minor on behalf of C.C.;
MINDY SMITH, as parent and next friend of a minor on behalf of E.S.;
NAACP–COLORADO–MONTANA–WYOMING STATE AREA CONFERENCES; and
THE AUTHORS GUILD,

      Plaintiffs,

v.

ELIZABETH SCHOOL DISTRICT,

      Defendant.

---

**Defendant's Opposition to the Motion for Preliminary Injunction**

---

**TABLE OF CONTENTS**

Table Of Contents ...................................................................................................... i

Table Of Authorities ................................................................................................. iii

I.   The Elizabeth School District (Schools, Leadership, and Educational Mission).......... 1

II.  The District's School Libraries Support and Enhance the District's Educational
     and Curricular Objectives ................................................................................. 3

III. The Curriculum Review Committee's Careful Evaluation of the District's Library
     Collections ...................................................................................................... 3

IV.  The Board's Approval and Implementation of the Library Protocols.......................... 7

V.   The Board's Decision to Permanently Remove the 18 of the Titles on the
     Suspended List ................................................................................................ 8

VI.  Plaintiffs Sue to Reverse the Board's Removal Decisions and Force the
     Challenged Books Back on the Shelf. .................................................................11

I.   None Of The Plaintiffs Have Standing To Challenge The Removals Of *#Pride*,
     *Crown*, Or *It's Your World* .............................................................................11

II.  None Of The Plaintiffs Have Made a "Clear Showing" Of Likely Success On
     Their First Amendment Claims ........................................................................ 12

     A.  A School Library's Curation Decisions Are Government Speech Immune
         From First Amendment Scrutiny .............................................................. 13

     B.  The School District Cannot Be Violating Plaintiffs' First Amendment "Right
         To Receive Information" When Each Of The 19 Disputed Books Remains
         Available For The Plaintiffs' Children And Members To Read And Check
         Out Through From The School District's Libraries .............................................. 17

     C.  The Three-Justice Plurality In *Pico* Is Nonprecedential, Doctrinally Stale,
         And Factually Infirm .................................................................................. 19

     D.  The Court Must Defer To The Board's Removal Decisions Under *Hazelwood*
         Because They Are Reasonably Related To Legitimate Pedagogical
         Concerns .................................................................................................. 21

     E.  Even If The Court Applies The *Pico* Plurality Standard, Plaintiffs Have Not
         Proven Unconstitutional Motive ................................................................ 24

     F.  Additional Points On The Authors' Viewpoint Discrimination Claim ................... 27

III.   The Plaintiffs Have Not Made A "Clear Showing" Of Irreparable Harm ................. 28

IV.  The Balance Of The Hardships Favors The District ............................................... 30

V.   The Public Interest Weighs Against A Preliminary Injunction................................. 30

# TABLE OF AUTHORITIES

## Cases

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 117 (11th Cir. 2009) ............................................................................ 20, 25

*Archuleta v. McShan*, 897 F.2d 495 (10th Cir. 1990) ...................................................... 17

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) ............................................. 20

*Board of Education of Westside Community. Schools v. Mergens By & Through
  Mergens*, 496 U.S. 226 (1990) ....................................................................... 22

*Board of Education v. Pico*, 457 U.S. 853 (1982) ................................................... passim

*C.K.-W. by & through T.K. v. Wentzville R-IV School District*,
  619 F. Supp. 3d 906 (E.D. Mo. 2022) .......................................................... 15

*Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995) ............... 15

*CK-W by and through TK v. Wentzville R-IV School District*,
  619 F. Supp. 3d 906 (E.D. Mo. 2022) .......................................................... 28

*Colo. Motor Carriers Ass'n. v. Town of Vail*, 2023 WL 8702074 (D. Colo.) .................... 29

*Epperson v. Arkansas*, 393 U.S. 97 (1968) ..................................................... 30

*FCC v. Pacifica Foundation*, 438 U.S. 726 (1978) ............................................... 28

*Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918 (10th Cir. 2002).... 21, 22, 23, 24

*Ginsberg v. New York*, 390 U.S. 629 (1968) ..................................................... 28

*GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024) ......... 21

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
  546 U.S. 418 (2006) ................................................................................... 24

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ................................. 20, 21, 23

*Jones v. District of Columbia*, 177 F. Supp. 3d 542 (D.D.C. 2016) ............................... 29

*Marks v. United States*, 430 U.S. 188 (1977) .................................................. 15

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) (per curiam) ................................. 11

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ........................................... 13, 14

*Muir v. Alabama Educational Television Comm'n*, 688 F.2d 1033 (5th Cir. 1982).... 15, 17

*Rust v. Sullivan*, 500 U.S. 173 (1991) ............................................................ 20

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ............................................. 12

*United States v. American Library Ass'n Inc.*, 539 U.S. 194 (2003) .............................. 18

*United States v. American Library Ass'n, Inc.*, 539 U.S. 194 (2003) ...................... 14, 18

*Valley Forge Christian College v. Americans United for Separation of Church and
  State, Inc.*, 454 U.S. 464 (1982) ....................................................... 12, 29

*Walls v. Sanders*, --- F. Supp. 3d ----, No. 4:24-CV-00270-LPR, 2024 WL 5192031
  (E.D. Ark. Dec. 20, 2024) ........................................................... 15, 17

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................... 12

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) ...........................11, 28

**Statutes**

C.R.S. § 22-31-105(1)(a)................................................................................... 1

C.R.S. § 22-32-108 ........................................................................................... 1

**Other Authorities**

11A Fed. Prac. & Proc. Civ. (3d ed.)............................................................. 29

**Treatises**

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41 ........................... 17

## INTRODUCTION

Plaintiffs ask this court to substitute its judgment regarding the appropriate content for the Elizabeth School District's libraries for that of the district's elected school board pending the resolution of this litigation on the merits. Because Plaintiffs are not harmed at all—let alone irreparably—by the school board's decision to remove books from the library shelves that the board has determined are incompatible with the pedagogical objectives of the district, they cannot make a clear showing that they are entitled to the extraordinary remedy of a preliminary injunction.

## FACTUAL BACKGROUND

**I.      The Elizabeth School District (Schools, Leadership, and Educational Mission)**

The Town of Elizabeth, Colorado sits approximately 45 miles southeast of Denver. The town's school district, aptly named the Elizabeth School District (the "District"), educates approximately 2,600 students across four traditional public schools. The District's elementary schools include Running Creek and Singing Hills—each educating preschool through fifth-grade students (ages 3–10). Elizabeth Middle School serves sixth through eighth grade (ages 10–14), and Elizabeth High School covers grades nine through twelve (ages 14–18). Snowberger Decl., at ¶ 5.

The District is governed by a five-director Board of Education (the "Board").[1] *See* C.R.S. § 22-31-105(1)(a). Directors are elected at regular biennial school elections, each for a term of four years. *Id.* A quorum of directors must be present for the Board to conduct

---

[1] The Board directors at the time the disputed books were suspended and later removed from the district's libraries were Rhonda Olsen, Olsen Decl., at ¶ 2; Heather Booth, Booth Decl., at ¶ 2; Mary Powell, Powell Decl., at ¶ 2; Mike Calahan, Calahan Decl., at ¶ 2; and Jonathan Waller, Waller Decl., at ¶ 2. Director Booth resigned on January 13, 2025, based on health issues. Booth Decl., at ¶ 3.

business, and the Board implements policy and other decision-making functions through a majority vote of directors present. *See generally* C.R.S. § 22-32-108.

Dan Snowberger is the District's superintendent and was unanimously appointed to the position by the then-Board of Education on March 13, 2023. Snowberger Decl., at ¶ 3. Superintendent Snowberger has a long and successful track record in educational leadership, spanning nearly four decades. *Id.*, at ¶ 4. As superintendent, he serves as the chief executive and operations officer of the District and is responsible for the primary instructional, financial, and operational functions of the District and its personnel. *Id.*, at ¶ 6.

One of the essential functions of Superintendent Snowberger's role is to ensure that the curriculum and materials used in classroom instruction align with the Board's vision and the values of the community. Snowberger Decl., at ¶ 7. To that end, Superintendent Snowberger collaborates extensively with the Board on a variety of initiatives to create a unified curriculum and improve the quality and consistency of the overall educational program. *Id.*

Within the District there has historically been a tremendous variety in what students have been learning in the classroom, and there has been very little integration between District schools and even within individual grade levels. *Id.* Through Superintendent Snowberger's leadership, the District has made it a top priority to provide an integrated approach to its educational program. *Id.* Specifically, the District has worked tirelessly to improve its curriculum and ensure that all students of the same grade level are taught the same core competencies such that those skills build upon themselves and lead to improved educational outcomes. *Id.* The District's efforts in this regard have already led to objective improvements to the quality of education within its four schools. *See e.g.*, *id.* n.3.

2

II.    **The District's School Libraries Support and Enhance the District's Educational and Curricular Objectives**

Each of the District's four traditional public schools has its own library. Students may not access or check out books except at the library of the school that they attend. Snowberger Decl., at ¶ 25. While the District's libraries may share some similarities with the local public library, the District has long regarded its school libraries as a component of its instructional materials as a whole. *See* Snowberger Decl., at ¶ 9; Ex. 1 (District Policy IJ). In other words, the purpose of the District's libraries is not to entertain the masses but to provide its students with materials of significant educational weight. *See* Snowberger Decl., at ¶ 9. Thus, the libraries are an essential part of the District's overall educational program. *Id.*

As with all instructional materials and curriculum used within the District, the Board is legally responsible for the school-library collections, Snowberger Decl., at ¶ 5, containing more than 50,000 titles, Snowberger Decl., at ¶ 26. But until recently the District did not have a uniform approach or policy with respect to purchasing, reviewing, and weeding library resources. *See* Snowberger Decl., at ¶ 12. Purchases were typically made on an ad hoc basis and often did not meaningfully consider (1) each book's suitability for a school setting, (2) the age-appropriateness of the book, and (3) how the book would support and reinforce the curriculum for the target age and grade level. *Id.* Further, publishers offer discount rates for bulk purchases, and the District additionally receives large book donations from a variety of sources. *Id.* The result has been that many books of questionable or even no educational value have made their way into District libraries. *Id.*

III.    **The Curriculum Review Committee's Careful Evaluation of the District's Library Collections**

In the fall of 2023, the Board became aware of a significant disconnect between its curricular goals and the content of the District's library collection. Snowberger Decl., at

¶ 11. Specifically, Board director Mike Calahan had reported that his then-11-year-old daughter (a sixth-grade student at Elizabeth Middle School) had checked out a book from her school library that was recommended by the publisher for "age 14+" and that contained profanity and explicit sexual content. *Id.* Accordingly, in its process of comprehensively aligning the District's curriculum and overall instructional materials, the Board became convinced that it was necessary to include the school-library collections in the effort, given the important role that school libraries play in the District's overall educational program. *See* Snowberger Decl., at ¶¶ 11–13.

The Board tasked a subcommittee, the Curriculum Review Committee (the "Curriculum Committee"), with reviewing the District's extensive library collection and proposing a clear policy to both guide that review and address student access to potentially controversial library content.[2] Snowberger Decl., at ¶ 11. Thus, the Curriculum Committee began the monumental task of both reviewing the significant collection of existing books on the shelves and developing a uniform and thoughtful approach to purchasing additional resources moving forward.[3] *Id.* at ¶ 12.

The Curriculum Committee began its work by drafting a set of written protocols (the "Library Protocols") for how the District should review books in its existing library

---

[2] The Curriculum Committee is co-chaired by Kim Moore, the District's Chief Academic Officer. Moore Decl., at ¶ 5. Ms. Moore has served in this role both as co-chair and Chief Academic Officer since April 2024. *Id.* at 2. Board directors Heather Booth and Mary Powell additionally served on the Curriculum Committee along with other parents, teachers, administrators, and community members. *Id.*; Booth Decl., at ¶ 7; Powell Decl., at ¶ 6.

[3] Although the Board expressed a long-term desire to replicate the libraries of schools that have collections limited to classics and soon-to-be-classics (similar to the approach taken by Liberty Common in Fort Collins, led by former State Senator and State Board of Education member Bob Schaffer), that type of large-scale replacement was simply not financially feasible at the time. Rather than shutting down school libraries in the interim, the Board decided to do the hard work of reviewing and weeding its existing collection. Snowberger Decl., at ¶ 11.

collection and how it should handle books that may contain sensitive topics. Snowberger Decl., at ¶ 14; Ex. 2 (Request for Board Action: 9.7 Library Sensitive Topic Protocol and Book Lists). The Library Protocols were designed with two main goals in mind: first, to advance the foundational purpose of the District's library services "to ensure that students have access to age-appropriate materials necessary to facilitate the [D]istrict's mission of providing students with excellent learning opportunities that inspire a passion for learning;" and second, to create a system of transparency in the District's library system by establishing: (i) a well-defined and consistent process for the ongoing evaluation of library resources and the acquisition of future library materials, (ii) parental access to student circulation history and the library registry, and (iii) a notification system to inform parents and guardians of materials their students are attempting to access that have been flagged for sensitive content. Moore Decl., at ¶ 7; Ex. 2, at 2.

To achieve these goals, the Library Protocols provided guidance and specific action steps related to three focus areas: (1) Analysis and Selection Process; (2) Sensitive Content Catalogs; and (3) Parental Access to Library Catalog and Student History (the "Protocols"). Snowberger Decl., at ¶ 14; Ex. 2, at 2–5. While the District and its Board could have easily weeded books with questionable educational value without any fanfare or public input, it was important to the Board that the Library Protocols and review process include complete transparency and feedback from the community. *See* Snowberger Decl., at ¶ 13. This approach aligned with District Policy KBB related to parental rights. *See* Ex. 9, (Parents Rights and Responsibilities). Specifically, the District firmly believes that parents have a right "[t]o know what curriculum and instructional materials are being used in their student's school." *Id.*

The Library Protocols also included a recommended list of books containing sensitive topics (the "Sensitive Topics List") as well as a smaller subset of 19 books to be

suspended pending further review by the Board (the "Suspended List"). Ex. 2, at 6–9. These lists were created pursuant to Protocol #1 concerning the analysis and selection process of District library books. *Id.* at 2-3. To develop the Sensitive Topics List and Suspended List, Curriculum Committee members were each assigned titles that had appeared on lists of frequently removed books from public school libraries. Powell Decl., at ¶ 7. Curriculum Counsel members would then cross-check those titles against the District's library catalog. *Id.* If a title from a list of frequently removed books appeared in one of the District's school libraries, or if the Curriculum Committee member identified a potentially problematic title through another source, they would then conduct a second-layer review to evaluate the book for specific content and age-appropriateness. *Id.*

The second-layer review included (i) reviewing third-party sources that evaluate books for younger audiences (e.g., BookLooks.org, Goodreads, Trigger Warning Database, Book Trigger Warnings, or the Junior Library Guild), and (ii) determining whether the work contained any of the topics flagged in the Library Protocols (*e.g.*, graphic violence, sexual content, profanity/obscenity, ideations of self-harm or mental illness, religious viewpoints, drug or excessive alcohol use, racism/discrimination). *Id.* If Curriculum Committee members remained concerned about the age-appropriateness of the content after this second-layer review, they would add the title to a spreadsheet and submit it to Chief Academic Officer Kim Moore, who combined them to create a single draft list for the Board to review.[4] *Id.* at ¶¶ 7–8.

---

[4] The same basic process was used for developing both the Sensitive Topic List and Suspended List. If the Curriculum Committee member believed that the content was highly sensitive, it was placed on the Suspended List warranting further scrutiny and review. *See* Powell Decl., at ¶ 9.

6

**IV.    The Board's Approval and Implementation of the Library Protocols**

The Library Protocols, including the Sensitive Topic List and Suspended List, were presented to the Board and approved on August 12, 2024, by a 4–0 vote.[5] Snowberger Decl., at ¶ 14. Upon Board approval, the District began a process to include the community in the review of the Suspended List of 19 titles that included highly sensitive content. *See* Snowberger Decl., at ¶ 16. Specifically, on August 16, 2024, Superintendent Snowberger sent a letter to the entire community inviting them to review these 19 titles and provide the Board with feedback on whether they were appropriate to remain on District shelves. *Id.*; Ex. 12 (August 16, 2024, Letter Re Parent Opportunity to Review Library Materials). Superintendent Snowberger specified the days and times that the books would be available for review and made clear that the District's priority was to "implement a system where parents are empowered to make important decisions on the content their children will be able to access and be alerted when sensitive content is checked out by their children." *Id.*[6]

After the Board approved the Library Protocols, the District implemented Protocol #2 concerning sensitive-content catalogs. Specifically, the District designed a system where parents automatically receive an email if their child checked out a book on the Sensitive Topics List and further allowed parents to exclude their children altogether from checking out these titles. Moore Decl., at ¶ 11.

---

[5] Director Calahan was not present. Calahan Decl., at ¶ 9; Ex. 4, (Aug 12, 2024, School Board Business Session Meeting Minutes), at 1.

[6] The community review period was open for 25 days, Snowberger Decl., at ¶ 16, during which time the 19 books were temporarily removed from the shelves, *id.* at ¶ 15. Of the 19 titles on the Suspended List, only 18 were made available for the community to review given that one (*Speak*) had been checked out and not returned during the review period. *Id.* at ¶ 16 n.7.

**V.     The Board's Decision to Permanently Remove the 18 of the Titles on the Suspended List**

On August 26, 2024, the Board held a work session where it had a robust and transparent discussion of the books on the Suspended List. *See* Powell Decl., at ¶ 11; *see also* Snowberger Decl., at ¶ 18; Ex. 7 (Aug 26, 2024, School Board Working Session Meeting Minutes). The Board heard from a variety of stakeholders, including Superintendent Snowberger, Chief Academic Officer Moore, other District staff members, parents, and community members. *See* Snowberger Decl., at ¶ 18. At this meeting, Board members read aloud excerpts from certain titles on the Suspended List. Snowberger Decl., at ¶ 19. For instance, Director Waller read a passage from *The Bluest Eye* by Toni Morrison:

> She might wonder again, for the six hundredth time, what it would be like to have that feeling while her husband's penis is inside her. The closest thing to it was the time she was walking down the street and her napkin slipped free of her sanitary belt. It moved gently between her legs as she walked. Gently, ever so gently. And then a slight and distinctly delicious sensation collected in her crotch. As the delight grew, she had to stop in the street, hold her thighs together to contain it. That must be what it is like, she thinks, but it never happens while he is inside her. When he withdraws, she pulls her nightgown down, slips out of the bed and into the bathroom with relief. … Or as she sits reading the uplifting thoughts of the Liberty Magazine, the cat will jump into her lap. She will fondle that soft hill of hair and let the warmth of the animal's body seep over and into the deeply private areas of her lap. Sometimes the magazine drops as she opens her legs.

*Id.* No formal Board action or decision-making occurred at the August 26th work session. *See* Ex. 7.

The Board's next regular business meeting was scheduled for September 9, 2024. Ex. 5 (Sept 9, 2024, School Board Business Session Meeting Minutes). At that meeting, the Board voted 4-0[7] to permanently remove the 18 of the 19 titles from the Suspended

---

[7] Director Booth was not present and did not vote on the Board's decision to permanently remove the 18 books. Booth Decl., at ¶ 9.

List.[8] *Id.* Board members considered many factors, including the problematic nature of the content, which included, without limitation, graphic violence, graphic sexual content, extreme drug and alcohol use, and suicidal ideation.[9] *See* Snowberger Decl., at ¶ 18; Olsen Decl., at ¶¶ 12, 28; Powell Decl., at ¶¶ 12, 31–37; Calahan Decl., at ¶¶ 10, 24; Waller Decl., at ¶¶ 9, 23. The overwhelming number of community members who reviewed the books on the Suspended List favored permanent removal. Snowberger Decl., at ¶ 18. Further, the books in question had no clear connection to the curriculum and contained little to no educational value or rigor. Snowberger Decl., at ¶ 18.

More importantly, no Board director voted to remove any of the 18 books based on the viewpoint expressed therein. Further, although Board directors considered the fact that community input overwhelmingly favored removal, their decisions were not based upon the individual viewpoints of community members who participated in the review process. Rather, all Board members based their removal decisions on the specific content of each book that they believed to be incompatible with the educational mission of the District. Olsen Decl., at ¶ 14; Powell Decl., at ¶ 14; Calahan Decl., at ¶ 12; Waller Decl., at ¶ 11.

The removal of the 19 titles on the Suspended List did not affect all four school libraries in the same way. Snowberger Decl., at ¶ 27. First, all 19 titles did not appear in every school library. For example, one title was removed from Running Creek Elementary School, five titles were removed from Elizabeth Middle School, and 15 titles were

---

[8] The title that was not available for public review was not permanently removed; it remains on the Suspended List. *See* Snowberger Decl. at ¶ 16 n.7.

[9] 15 of the 19 at-issue titles were reviewed by BookLooks.org and rated a "3" or "4." *See* Ex. 11 (BookLooks Ratings). According to BookLooks, its rating system is designed to assess the appropriateness of a book for a child or young adult based on the content of the book taken as a whole. *Id.* at 1. A "3" rating means "Minor Restricted: Under 18 requires guidance of a parent or guardian." A "4" rating means "No Minors: Adult content. No child under 18." *Id.* at 2.

removed from Elizabeth High School. *Id.* Second, titles that appeared in two libraries were not necessarily removed from both. *It's Your World—If You Don't Like It, Change It: Activism for Teenagers*, was in both the middle-school library and the high-school library, but it was only removed from the middle school library due to concerns that the content was not age appropriate for students between the ages of 10 and 14. *Id.* Thus, this particular book is still available at the Elizabeth High School library. *Id.*

The Board's removal decision affected less than 0.05% of the District's catalog, and the libraries still have a diverse collection of books on a range of subjects, Snowberger Decl., at ¶ 26, including those subjects specifically scrutinized by Plaintiffs, *see id.* at ¶ 36. Moreover, many of the same authors continue to have books on District shelves. Snowberger Decl., at ¶ 30. The 19 books that the Board removed are the work of 13 discrete authors. *Id.* Of those 13 authors, eight currently have at least one work included in the District's collection. *Id.* Finally, despite being in the District's collection for years, eight of the 19 titles had never been checked out, and another eight had been checked out five times or fewer, even when considering renewals by the same student. *Id.* at ¶ 28.

As of January 27, 2025, the District decided to place copies of each of the 19 titles that the School Board voted to remove in the library from which they were taken. Snowberger Decl., at ¶ 38. These titles are available only to C.C., E.S., or any student who is either a member of the NAACP — Colorado–Montana–Wyoming State Area Conference ("NAACP"), or who has a parent or guardian who is a member of the NAACP. *Id.* All the current members of the School Board are aware of and have approved the return of the disputed books for the purpose of allowing the plaintiffs in this litigation to browse, read, or check out those books in the school district's libraries. Olsen Decl., at ¶ 38; Powell Decl., at ¶ 42; Waller Decl., at ¶ 31; Calahan Decl., at ¶ 31.

**VI.    Plaintiffs Sue to Reverse the Board's Removal Decisions and Force the Challenged Books Back on the Shelf.**

On December 19, 2024, Plaintiffs filed a Complaint against the District alleging First Amendment violations other related claims under the Colorado Constitution. ECF No. 1 (Pls.' Compl.). Plaintiffs' Motion for Preliminary Injunction followed the next day, ECF No. 9 (Pls.' Mot. for Prelim. Inj.).

## LEGAL STANDARD

To obtain a preliminary injunction, the plaintiffs needed to make a "clear showing" of: (1) likely success on the merits; (2) a likelihood that the plaintiffs will suffer irreparable harm absent preliminary relief; (3) that the balance of equities tips in the plaintiffs' favor; and (4) that a preliminary injunction is in the public interest. *See Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 971, 972 (1997) (per curiam).

## ARGUMENT

**I.    None Of The Plaintiffs Have Standing To Challenge The Removals Of *#Pride*, *Crown*, Or *It's Your World***

Students in the Elizabeth School District cannot access or check out library books held at other schools within the district. *See* Snowberger Decl. ¶ 25. So while C.C. has alleged Article III standing to sue over the 15 disputed books held at the high-school library, she has no standing to challenge the book removals from the middle-school library or Running Creek Elementary. A student does not suffer "injury in fact" from book removals at a school library that she cannot access. E.S. has likewise alleged standing only to challenge the book removals at the school that she currently attends (Running Creek Elementary). Any injury based on the future possibility that four-year-old E.S. might someday enroll at the Elizabeth School District's middle school and seek to access the disputed

books at the middle school's library is too speculative and unripe to support a justiciable controversy. *See Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("[A] threatened injury must be 'certainly impending' to constitute injury in fact."); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014).

None of the other plaintiffs have made a "clear showing" of standing to challenge the removals of *#Pride*, *Crown*, or *It's Your World* from the middle school. None of these books were written by members of The Authors Guild. *See* Pls. Br., ECF No. 9, at 12–13. And the NAACP's declaration fails to identify any NAACP member who attends the middle school or has children who attend. *See* Prescott Decl., ECF No. 9-4, at ¶ 8 (referring to "[o]ne NAACP member who has a child at Running Creek Elementary"). That some NAACP members may experience feelings of anguish or distress from the removal of these books from the middle-school library does not supply a basis for Article III standing. *See id.* at ¶ 10; *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 485 (1982) ("[T]he psychological consequence presumably produced by observation of conduct with which one disagrees [is] not an injury sufficient to confer standing under Art. III"). And the NAACP members who have "removed their children from Elizabeth schools" have no stake in this controversy because their children no longer attend the district's schools and cannot access any books in those libraries.

## II. None Of The Plaintiffs Have Made a "Clear Showing" Of Likely Success On Their First Amendment Claims

The plaintiffs cannot make a "clear showing" of likely success on the merits of their First Amendment claims because a school library's curation decisions are government speech immune from First Amendment scrutiny. Even if the district's curation decisions were not government speech, Plaintiffs cannot show any harm to their purported First Amendment right to access information because the books at issue remain available to

them in the school libraries. Moreover, the standard advocated by Plaintiffs—the three-justice plurality opinion in *Pico*—is nonprecedential and doctrinally stale; to the extent there is a First Amendment inquiry here, it must proceed under the rubric for curricular-related speech bearing the imprimatur of the district established in *Hazelwood*. Finally, even if this Court were to (incorrectly) apply the *Pico* plurality opinion, Defendant easily satisfies that standard because it is not withholding access to the titles at issue for narrowly partisan or political reasons.

> **A.    A School Library's Curation Decisions Are Government Speech Immune From First Amendment Scrutiny**

The plaintiffs' First Amendment claims cannot get off the ground because a school library's curation decisions are government speech immune from First Amendment scrutiny. A library's curating decisions are no less "speech" than a social-media company's decisions regarding the third-party speech that it chooses to convey on its platforms. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024) ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). As the Supreme Court explained in *NetChoice*:

> An entity "exercis[ing] editorial discretion in the selection and presentation" of content is "engage[d] in speech activity." *Arkansas Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). And that is as true when the content comes from third parties as when it does not. (Again, think of a newspaper opinion page or, if you prefer, a parade.) Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own. And that activity results in a distinctive expressive product.

*Id.* at 731. And "none of that changes just because a compiler includes most items and excludes just a few." *Id.* at 732; *see also id.* at 738 ("That those platforms happily convey the lion's share of posts submitted to them makes no significant First Amendment difference."). Most libraries are willing to carry the vast majority of available books, but that

does not mean that they are no longer engaged in "speech" when they choose to exclude certain materials from their collections. *See United States v. American Library Ass'n Inc.*, 539 U.S. 194, 204 (2003) (Rehnquist, C.J.) (plurality opinion) ("[L]ibraries collect only those materials deemed to have 'requisite and appropriate quality.'"); *id.* ("'The librarian's responsibility . . . is to separate out the gold from the garbage, not to preserve everything'" (quoting W. Katz, *Collection Development: The Selection of Materials for Libraries* 6 (1980)).

And a library's acquisition and weeding decisions remain its own "speech" even though a library is conveying the speech of others when deciding whether to include materials in its collection. Like a social-media platform, a library is "in the business . . . of combining 'multifarious voices' to create a distinctive expressive offering." *NetChoice*, 603 U.S. at 738. As *NetChoice* explains:

> The individual messages may originate with third parties, but the larger offering is the platform's. It is the product of a wealth of choices about whether—and, if so, how—to convey posts having a certain content or viewpoint. Those choices rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so). And in the aggregate they give the feed a particular expressive quality.

*Id.* at 738. So too with a library. The "individual messages" originate with the authors, but "the larger offering" is the library's speech. *See id.* And a library's acquisition and weeding decisions "rest on a set of beliefs about which [materials] are appropriate" to include in the library's collection and "which [materials] are not." *Id.* Finally, the aggregate of the library's curating decisions gives the collection "a particular expressive quality" unique to that library. A library is "engage[d] in speech activity"[10] when it curates its collection, and

---

10.    *NetChoice*, 603 U.S. at 731 (quoting *Arkansas Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)).

a public-school library's acquisition and weeding decisions are government speech im-
mune from First Amendment attack.

The plaintiffs do not even discuss the government-speech point or acknowledge the
holding of *NetChoice*, and they appear to believe that *Board of Education, Island Trees
Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), not only forecloses the
school district's government-speech argument but somehow enshrines a three-justice
plurality opinion as the law of the land. *See* Pl. Mot., ECF No. 9, at 14–21. But the justices
in *Pico* failed to produce a rationale that garnered five or more votes, and in these situa-
tions the Supreme Court instructs lower courts to follow the opinion of the justice (or jus-
tices) who "concurred in the judgments on the narrowest grounds." *Marks v. United
States*, 430 U.S. 188, 193 (1977); *see also id.* ("When a fragmented Court decides a case
and no single rationale explaining the result enjoys the assent of five Justices, 'the holding
of the Court may be viewed as that position taken by those Members who concurred in
the judgments on the narrowest grounds . . . .'" (quoting *Gregg v. Georgia*, 428 U.S. 153,
169 n.15 (1976) (Stewart, Powell, and Stevens, JJ.)). In *Pico*, the controlling opinion un-
der *Marks* belongs to Justice White, who concurred in the judgment and refused to join
any portion of Justice Brennan's plurality opinion. *See Pico*, 457 U.S. at 883–84 (White,
J., concurring in the judgment); *Campbell v. St. Tammany Parish School Board*, 64 F.3d
184, 189 (5th Cir. 1995) ("Justice White's concurrence in *Pico* represents the narrowest
grounds for the result in that case"); *Muir v. Alabama Educational Television Comm'n*, 688
F.2d 1033, 1045 n.30 (5th Cir. 1982) ("[T]he opinion of Justice White [is] the narrowest
grounds for the judgment [in *Pico*]."); *C.K.-W. by & through T.K. v. Wentzville R-IV School
District*, 619 F. Supp. 3d 906, 913 (E.D. Mo. 2022) ("Justice White's opinion [in *Pico*]
therefore controls"); *Walls v. Sanders*, --- F. Supp. 3d ----, No. 4:24-CV-00270-LPR, 2024
WL 5192031, at *7 n.49 (E.D. Ark. Dec. 20, 2024) ("Justice White's decisive concurrence

15

in the judgment . . . controls under *Marks v. United States*, 430 U.S. 188, 193 (1977)").

Yet Justice White's opinion refused to weigh in on the constitutional standards for deter-

mining whether a library-book removal violates the First Amendment:

> The District Court found that the books were removed from the school li-
> brary because the school board believed them "to be, in essence, vulgar."
> 474 F. Supp. 387, 397 (E.D.N.Y. 1979). Both Court of Appeals judges in the
> majority concluded, however, that there was a material issue of fact that
> precluded summary judgment sought by petitioners. The unresolved factual
> issue, as I understand it, is the reason or reasons underlying the school
> board's removal of the books. I am not inclined to disagree with the Court
> of Appeals on such a fact-bound issue and hence concur in the judgment of
> affirmance. Presumably this will result in a trial and the making of a full rec-
> ord and findings on the critical issues.
>
> The plurality seems compelled to go further and issue a dissertation on the
> extent to which the First Amendment limits the discretion of the school board
> to remove books from the school library. I see no necessity for doing so at
> this point. . . . [I]f there is an appeal, if there is dissatisfaction with the sub-
> sequent Court of Appeals' judgment, and if certiorari is sought and granted,
> there will be time enough to address the First Amendment issues that may
> then be presented. . . .
>
> We should not decide constitutional questions until it is necessary to do so,
> or at least until there is better reason to address them than are evident here.
> I therefore concur in the judgment of affirmance.

*Pico*, 457 U.S. at 883–84 (White, J., concurring in the judgment). The controlling opinion

in *Pico* remains entirely agnostic on whether the First Amendment imposes *any* con-

straints on book-removal decisions made by public-school libraries, and it merely concurs

in a judgment that affirms a federal court of appeals' decision vacating a ruling that

granted summary judgment for the school district and remanding the case for trial. *See*

*id.* at 856–61 (Brennan, J.) (plurality opinion) (describing the lower-court proceedings).

So there is *no* precedent from the Supreme Court that prevents this Court from following

*NetChoice* and holding that school-library curating decisions are government speech

16

immune from First Amendment scrutiny. *See Muir*, 688 F.2d at 1045 n.30 ("*Pico* . . . decided neither the extent nor, indeed, the existence vel non., of First Amendment implications in a school book removal case."); *Walls*, 2024 WL 5192031, at *7 ("Justice White's decisive concurrence in the judgment . . . was anodyne enough that nearly nothing of substance was actually done in *Pico.*").

**B.    The School District Cannot Be Violating Plaintiffs' First Amendment "Right To Receive Information" When Each Of The 19 Disputed Books Remains Available For The Plaintiffs' Children And Members To Read And Check Out Through From The School District's Libraries**

There is an additional reason why the plaintiffs cannot show that the school district is violating their constitutional rights: Each of the 19 disputed books remains available in the school district's libraries for C.C., E.S., and the members of the NAACP and their children to read, browse, or check out. *See* Snowberger Decl. at ¶¶ 38–41. The defendants cannot be violating the plaintiffs' "right to receive information" when each of the plaintiffs retains the same ability to access the 19 disputed books in the school district's libraries that they had before the books were removed. And the plaintiffs cannot obtain a preliminary injunction by complaining that *other* students can no longer access the 19 disputed books through the school district's libraries, because the plaintiffs must establish a violation of their own constitutional rights and not someone else's. *See Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990) ("[A] section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else"); David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45.

Library patrons do not suffer violations of their First Amendment "right to receive information" when their desired books remain available to them in a library but are not placed on the library shelves. Many materials in a library's collection can be obtained only by asking a librarian for assistance, such as books stored in a rare-book room, books that

are difficult to find, or books that are made available only through interlibrary loan. A library cannot be sued under 42 U.S.C. § 1983 whenever it offers materials to library patrons that are not available on the library's shelves, and a library does not violate anyone's First Amendment "right to receive information" by offering books in a manner that requires patrons to seek a librarian's assistance. What's more, Justice Kennedy's and Justice Breyer's concurrences in *United States v. American Library Ass'n Inc.*, 539 U.S. 194 (2003), make clear that "small" or non-significant burdens on a library patron's ability to obtain materials do not violate the First Amendment. *See id.* at 215 (Kennedy, J., concurring in the judgment) (upholding restriction after concluding that the plaintiffs failed to "show that the ability of adult library users to have access to the material is burdened in any significant degree"); *id.* at 220 (Breyer, J., concurring in the judgment) (upholding restriction given the "comparatively small burden that the Act imposes upon the library patron"). Here, the plaintiffs have yet to identify *any* burden that might be imposed on C.C., E.S., or the members of the NAACP or the children of their members, as the school district has spared them the inconvenience of having to search for the disputed books on the library shelves and allows them to obtain their desired book directly from a librarian. And even if the plaintiffs attempted to theorize or concoct a "burden," it would be far less than the burdens imposed by Children's Internet Protection Act, which required adult library patrons to ask a librarian to unblock filtered materials before internet access would be allowed. *See id.* at 199–201.

The members of the Authors Guild also cannot show a violation of their First Amendment rights when their books remain in the school district's libraries and remain available to C.C., E.S., and the members (and children of members) of the NAACP. The plaintiffs failed to produce evidence that any students other than C.C., E.S., or the NAACP's members and their children have any interest in accessing the disputed books

written by members of the Authors Guild, so they cannot show that the school's curation decisions have impeded their right to have these children access their works.

### C.    The Three-Justice Plurality In *Pico* Is Nonprecedential, Doctrinally Stale, And Factually Infirm

Plaintiffs simply assume that the Court will apply the three-justice plurality opinion in *Board of Education v. Pico*, 457 U.S. 853 (1982), even though this plurality opinion has no status as law. (PI Mot. 16–17.) The Tenth Circuit has never endorsed the *Pico* plurality opinion. Neither should this Court.

A three-justice plurality in *Pico* tried to invent a new First Amendment right for students in schools—a "right to receive" information in their school library, even when that information remains available elsewhere, and even when the school district does nothing to impede a student's efforts to obtain the desired information from other sources. *Id.* at 866. The plurality attempted to fashion a "constitutional" standard for evaluating challenged book removals: while school boards have broad discretion to run their schools, including discretion to remove books from the school library, "that discretion may not be exercised in a *narrowly partisan or political manner*" such that it's the "decisive factor" in the board's decision. *Id.* at 870–71 (emphasis added). The plurality opinion was sharply criticized. "If the school board can set the curriculum, select teachers, and determine initially what books to purchase for the school library, it surely can decide which books to discontinue or remove from the school library so long as it does not also interfere with the right of students to read the material and to discuss it." *Id.* at 921 (O'Connor, J., dissenting). "[E]lementary and secondary schools are inculcative in nature," and school libraries "serve as supplements to this inculcative role." *Id.* at 915 (Rehnquist, J., dissenting). Libraries are "tailored, as the public school curriculum is tailored, to the teaching of basic

skills and ideas" for success in the community; and that is the job of educators, not federal courts. *Id.*

The three-justice *Pico* plurality opinion "is a non-decision so far as precedent is concerned," *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1200 (11th Cir. 2009), which is reason enough to disregard it. But there are other reasons why this Court should eschew the analysis of the three-justice *Pico* plurality. *First*, the *Pico* plurality opinion predates the Supreme Court's government-speech doctrine, which applies to curation of the District's school libraries (*see infra* subsection I.C). *See Rust v. Sullivan*, 500 U.S. 173, 199–200 (1991). *Second*, the Supreme Court has consistently narrowed student speech rights in secondary schools since *Pico*. It has limited students' expressive speech rights in schools, emphasizing schools' unique educational role and the need for operational order and efficiency. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986). It has limited students' rights vis-à-vis school-sponsored or curricular speech, recognizing that school boards have maximum discretion over speech the public may perceive as bearing the imprimatur of the school. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270–71 (1988). The clear message since *Pico* is that schools need flexibility to fulfill their educational mission, even when it requires limiting some forms of expression.

*Third* and finally, the three-justice *Pico* plurality opinion is premised on a false assumption. The plurality assumed that the school library in *Pico* was "the principal locus" of free inquiry. 457 U.S. at 868–69. Perhaps that's true of the libraries at research universities like the University of Colorado, or potentially even a large public library with broad appeal, but the District's libraries are not places of unrestrained inquiry or entertainment. *See* Snowberger Decl. at ¶ 9. They support and enhance the educational and curricular objectives of the District. Federally required firewalls and internet filters limit students' web

access; similarly, the school library shelves are curated to further a defined educational mission. *See* Snowberger Decl. at ¶ 18 n.10.

### D. The Court Must Defer To The Board's Removal Decisions Under *Hazelwood* Because They Are Reasonably Related To Legitimate Pedagogical Concerns

While Plaintiffs' First Amendment claims should start and end with government speech, the Supreme Court's decision in *Hazelwood* also bars their claims. School boards have maximum deference over curricular and school-sponsored speech. *Hazelwood*, 484 U.S. at 271. The rule of *Hazelwood* applies both to "activities conducted as part of the school curriculum" and to "activities that might reasonably be perceived to bear the imprimatur of the school." *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 924 (10th Cir. 2002). The District's decisions regarding its libraries fit both categories.

*First,* the District's libraries are necessary components of the District's broader curriculum. The District's long-standing policy makes this clear: "Instructional materials for school classrooms *and school libraries* shall be selected by the appropriate professional personnel . . . . All instructional resources and materials *shall be aligned with the district's academic standards and support the district's educational objectives*." Ex. 1 (emphasis added); *see also* Snowberger Decl. at ¶ 9. The District's policy is common sense; "[t]he purpose of public school libraries is to advance the school curriculum—that is, to facilitate the pedagogical mission of the school, which may involve some limitation of expression." *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 670 (8th Cir. 2024). And the policy-making body of schools—school boards—have the institutional competence in educational and pedagogical decision-making. They have both the expertise and responsibility to shape curriculum and educational resources based on the community's needs and educational goals. If the school band, drama club, and choir are constitutional adjuncts of a school's curriculum, *Board of Education of Westside Community. Schools v.*

*Mergens By & Through Mergens*, 496 U.S. 226, 246 (1990), then surely school libraries are within the curricular activities or resources "that affect learning," *Fleming*, 298 F.3d at 925.

*Second*, the District's libraries bear the imprimatur of the District and its pedagogical concerns. "The imprimatur concept covers speech that is so closely connected to the school that it appears the school is somehow sponsoring the speech." *Fleming*, 298 F.3d at 925. Unquestionably, book selection and removal decisions by the Board signal its educational priorities and bear directly on the public's perception of the District's educational quality and operational order. No one can dispute that, if the District's libraries included a collection of back-issues of *Playboy*, the community would rightly question the educational priorities of the District. The same could be said if the District housed a collection of books promoting frauds—like Holocaust denial, that life in North Korea compares favorably to life in the Unites States, or that the Apollo 11 moon landing was faked— or overt racism. *Hazelwood* allows school boards to avoid this. Indeed, "[m]any cases have applied a *Hazelwood* analysis to activities outside the traditional classroom … to avoid controversy within a school environment." *Id.* at 926 (collecting cases).

If the first part of *Hazelwood* is satisfied, "the school may impose restrictions … so long as those restrictions are reasonably related to legitimate pedagogical concerns." *Id.* at 924. The reasonably-related-to-legitimate-pedagogical-concerns standard is an objective one. "Pedagogical means related to learning," and the Tenth Circuit "give[s] substantial deference to educators' stated pedagogical concerns." *Id.* at 925. The scope of "legitimate pedagogical concerns" is broad and includes discipline, courtesy, and the avoidance of controversy. "[T]he pedagogical concern in *Hazelwood* itself was to avoid the controversial subjects of pregnancy and divorce in a school setting[.]" *Id.* at 926.

Because of the types of educational decisions that "face educators in 'awakening the child to cultural values' and promoting conduct consistent with 'the shared values of a civilized social order,'" the Tenth Circuit has rejected viewpoint neutrality under *Hazelwood*. *Id.* at 928 (cleaned up). For instance, a school must be able to refuse speech that "might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with 'the shared values of a civilized social order,' or to associate the school with any position other than neutrality on matters of political controversy." *Hazelwood*, 484 U.S. at 272 (citation omitted).

The Board's removal decisions here easily clear the "reasonable relation to a legitimate pedagogical concern" bar. The removal decisions were part of a broad effort to standardize the District's curriculum to enhance educational value. The District has purchased and adopted a new science curriculum, recognized opportunities to improve student proficiency in reading, and is evaluating a new social-studies curriculum. *See* Snowberger Decl. at ¶ 8. At the same time, the Board directed the District to reevaluate the books in the District's school libraries to align them with the District's curricular and educational goals. *See* Snowberger Decl. at ¶¶ 7, 13. This meant removing select books with sexually explicit content, including base vulgarity, that were not age appropriate for the respective school library, or that promoted discourse or indoctrination on sensitive and controversial topics best left to parents as the primary educators of their children. *See* Snowberger Decl. at ¶¶ 13, 20, 43. If a school principal can unilaterally pull an article in the school newspaper on teen pregnancy and the impact of divorce on students, *Hazelwood*, 484 U.S. at 272–73, surely the Board can identify core competencies and educational objectives and direct the District to thoroughly (and transparently) evaluate the books in the school libraries and remove those that are inconsistent with the District's pedagogical concerns. In the end, "*Hazelwood* entrusts to educators these decisions,"

even if the decision is based on "viewpoint." *Fleming*, 298 F.3d at 928. Here, the Board's removal decisions were well within its constitutional discretion under *Hazelwood*.

**E.    Even If The Court Applies The *Pico* Plurality Standard, Plaintiffs Have Not Proven Unconstitutional Motive**

Plaintiffs concede the *Pico* plurality's standard is limited: "school boards cannot constitutionally exercise their discretion to determine the content of school libraries 'in a narrowly partisan or political manner'." (Pl. Mot. 17 (quoting *Pico*, 457 U.S. at 870 (plurality opinion of Brennan, J.)).) Not only must the school board's motive be "narrowly partisan or political," but this "unconstitutional" intent must be "the decisive factor in [the board's] decision." *Pico*, 457 U.S. at 871. "Decisive factor" means "'substantial factor' in the absence of which the opposite decision would have been reached." *Id.* at 871, n.22. Examples of impermissible motive include: "[i]f a Democratic school board, motivated by party affiliation, ordered the removal of *all* books written by or in favor of Republicans," *id.* at 870–71 (emphasis added); or, "if an all-white school board, motivated by racial animus, decided to remove *all* books authored by blacks or advocating racial equality and integration," *id.* at 871 (emphasis added). To the *Pico* plurality, an intent to remove *all* books on one side of a political or partisan debate while leaving others, "would be to encourage" a "sort of officially prescribed orthodoxy." *Id.*

On the other hand, the *Pico* plurality opined it would be "perfectly permissible" for a school board to remove books based on vulgarity or the "educational suitability" of the book. *Id.* Such removals "would not carry the danger" of prescribing orthodoxy in partisan or political matters by eliminating contrary views. *Id.*

"[T]he burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Here, even if this Court were to plow new ground by adopting the three-justice *Pico* plurality's

standard, to carry their burden, Plaintiffs must show unconstitutional motive.[11] And the relevant motive is the Board's—no one else's.

Plaintiffs don't try to carry this burden. They simply claim that "the Board did—and continues to—remove books because of the ideas they contain." (Pl. Mot. 18.) That's not the standard. To prove unconstitutional motive, the three-justice *Pico* plurality requires the Board's decision (1) be narrowly partisan or political; (2) the partisan-or-political motive be the "decisive factor" in the removal; and, through the decision, (3) the school board sought "to prescribe what shall be orthodox" in the school. *Pico*, 457 U.S. at 871, 872 (cleaned up). Plaintiffs have not—and cannot—carry their burden of proving unconstitutional motive; their thin, inadmissible, out-of-context evidence certainly does not warrant broad injunctive relief.

***The Board's Decision was not partisan or politically motivated.*** Plaintiffs do not identify the Board's partisan-or-political motives other than vague references to the Board's "conservative values." Pl. Mot. 21. Plaintiffs' own evidence undermines any after-the-fact claim of rank-partisan motivation. As Plaintiffs acknowledge, the Board's book review tags included "'racism/discrimination,' 'religious viewpoints,' 'sexual content,' 'graphic violence,' 'profanity/obscenity,' 'drug or excessive alcohol use,' and 'ideations of self-harm or mental illness.'" (Pl. Mot. 19 (quoting Ex. 7).) These aren't partisan or political categories, and Plaintiffs do not claim otherwise. Nor are these categories unique to "conservative values," whatever Plaintiffs mean by that phrase. These are common-sense identifiers to guide the decision to remove select books with explicit, age-inappropriate, or overly controversial content from the District's libraries. A complete account of the

---

[11] Because a district court's finding of motive under the three-justice *Pico* plurality standard "depends on constitutional facts," appellate courts review lower courts' findings de novo. *See ACLU of Fla.*, 557 F.3d at 1206; *see also id.* at 1204 ("[U]nder the *Pico* plurality standard we are assuming applies, the Board's motive is the ultimate fact upon which the resolution of the constitutional question depends.").

Board's process (as opposed to Plaintiffs' litigation narrative) shows the Board followed a principled, thorough, and transparent process to evaluate the educational suitability of the books in the District's libraries. *See* Snowberger Decl. at ¶¶ 13–21. That process accords with the three-justice *Pico* plurality's direction: "This would be a very different case if the record demonstrated that [the school board] had employed established, regular, and facially unbiased procedures for the review of controversial materials." *Pico*, 457 U.S. at 874.

>    ***Politics or Partisan Motivations were not a decisive factor.*** Plaintiffs do not acknowledge the "decisive factor" requirement, much less carry their burden and prove it. The closest Plaintiffs come is citing two out-of-context emails from *two* of five Board members.[12] *See* Pl. Mot. 19 (citing Exs. 12 and 14). Again, the Board's actual process, described in the District's supporting declarations, conclusively establishes that the Board's removal decisions were not one-dimensional based on partisan-or-political motive. Rather, the Board's decisions were guided by multiple factors (as Plaintiffs, perhaps inadvertently, concede, *see* Pl. Mot. 19 (outing various review considerations), which themselves were informed by multiple resources, including online book-review publications and rating systems for primary and secondary schools, and the views of Superintendent Snowberger, parents, teachers, and other community members. *See* Snowberger Decl. at ¶¶ 13–21. Again, this process is in accord with the *Pico* plurality. *See Pico*, 457 U.S. at 874 (noting the school board "ignored 'the advice of literary experts,' the views of 'librarians and teachers within [the district],' the advice of the Superintendent of Schools, and the guidance of publications that rate books for junior and senior high school students").

---

[12] One of the two Board members referenced, Heather Booth, no longer serves on the Board and did not vote to permanently remove books from the District's libraries. *See* Booth Decl. at ¶ 9.

***The Board's Decision Was not made to Prescribe Partisan Orthodoxy.*** Lastly, Plaintiffs' thin claim that the Board is imposing its "partisan, political orthodoxy" on students is against the facts. (*See* Pl. Mot. 21.) *First*, Plaintiffs cannot seriously contend that removing books with sexually explicit and vulgar content (whether by a straight, lesbian, gay, bisexual, transsexual, or queer character) imposes a political orthodoxy. Opposition to indecency in schools is surely not limited to those espousing "conservative values" (or "liberal" or "moderate" values for that matter). *Second*, the *Pico* plurality's concern with school boards prescribing orthodoxy was with the elimination of one viewpoint to elevate contrary remaining viewpoints. *Pico*, 457 U.S. at 871. Here, Plaintiffs try to frame the Board's removal decisions as the suppression of LGBTQ and racial views with which Board members supposedly disagreed. (Pl. Mot. 21.) Beyond categorically labeling the Board's views as undefined "conservative values," Plaintiffs are silent on the Board's actual views. More simply though, Plaintiffs' narrative isn't doesn't survive contact with reality. Today, a District student interested in LGBTQ history, self-narrative, or authors will find many such books on the library shelves. *See* Snowberger Decl. ¶ 35. The same can be said about "race." *See id.* at ¶ 36. While it may be convenient for Plaintiffs to claim in unchecked legal filings and promotional materials on social media, Plaintiffs' "political orthodoxy" narrative ignores the Board's deliberative and balanced approach to the removal decisions.

### F.    Additional Points On The Authors' Viewpoint Discrimination Claim

The guild member authors' viewpoint discrimination claims fail for an additional reason: the Elizabeth School District's libraries are not a public forum for the authors' expression. Rather, because they serve defined communities of students and school employees (as opposed to the general public) the School Board's removal of the 19 titles is garden-variety regulation of access to a non-public forum. Even outside the walls of a

27

school, the Supreme Court has acknowledged that the otherwise absolute interest of adult speakers to reach an unlimited audience must give way in the context of minors where the adult's speech is sexually explicit. *See Ginsberg v. New York*, 390 U.S. 629, 639–40 (1968) (affirming the constitutionality of a state law banning the sale of non-obscene sexually oriented material to minors); *FCC v. Pacifica Foundation*, 438 U.S. 726, 732 (1978) (affirming FCC's power to regulate speech that is indecent, obscene or profane and noting offending broadcast was made during an hour when "children were undoubtedly in the audience"). If public forums can be curbed to protect minors from inappropriate speech, of course the non-public forum of a school library may be made unavailable to the same.

## III.    The Plaintiffs Have Not Made A "Clear Showing" Of Irreparable Harm

The plaintiffs cannot identify *any* harm (let alone an "irreparable" harm) that could befall C.C., E.S., or the NAACP members (or the children of NAACP members) who are students in the Elizabeth School District, as each of the previously removed books is now available for them to read, browse, or check out in the library from which it was taken. *See* Snowberger Decl. at ¶¶ 38–41; *see also CK-W by and through TK v. Wentzville R-IV School District*, 619 F. Supp. 3d 906, 919 (E.D. Mo. 2022) (removal of books from school library did not inflict irreparable harm because it "does not stop any student from reading or discussing the book"). The plaintiffs do not deny that it is easier for them to obtain a book by asking for it at the reference desk rather than by searching a catalog, traipsing among the shelves, and pawing through the books.

The plaintiffs would prefer that the books be returned to the library shelves so that *other* students can check them out, but that does not inflict irreparable harm *on the plaintiffs*. *See Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish . . . that *he is* likely to suffer irreparable harm in the absence of preliminary relief." (emphasis added)); *Jones v. District of*

*Columbia*, 177 F. Supp. 3d 542, 546 n.3 (D.D.C. 2016) ("[T]he irreparable harm prong . . . only concerns harm suffered by the party or parties seeking injunctive relief . . . . [A]ny alleged harm to third parties is properly addressed under the public interest prong"). And the distress that the plaintiffs may experience over the plight of other library patrons is not an Article III injury, let alone "irreparable harm." *See Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 485–86 (1982).

Plaintiffs argue, formulaically, that there is a presumption of irreparable injury where First Amendment rights are implicated. Pl. Mot. at 25. But even if such a presumption were warranted—and it is not given the weakness of Plaintiffs' claims on the merits—it would be rebutted here by the simple fact that Plaintiffs cannot show irreparable harm to their First Amendment rights to access and receive information when each of the 19 disputed books remain available for the plaintiffs.

Finally, Plaintiffs' delay in seeking a preliminary injunction implies a lack of irreparable harm and in and of itself warrants denial of preliminary relief. "Courts in both this jurisdiction and others have uniformly determined that a movant's delay in seeking injunctive relief warranted the relief's denial." *Colo. Motor Carriers Ass'n v. Town of Vail*, 2023 WL 8702074 at *12 (D. Colo.) (collecting cases holding that three months or more delay in seeking a preliminary injunction implies that the harm complained of is not serious enough to warrant the extraordinary remedy of a preliminary injunction). Here, Defendants determined to permanently remove the titles on September 9, three and a half months before Plaintiffs' December motion for preliminary injunction. Compl. ¶ 127. This is a tell that Plaintiffs—whatever the merits of their claims—do not believe their harm is irreparable. 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ("[L]ong delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.") (citations omitted).

## IV.    The Balance Of The Hardships Favors The District

While Plaintiffs' claim of irreparable harm is weak, the harm to the District that would be occasioned by Plaintiffs' requested preliminary injunction is considerable. The District would be forced to purchase, catalog, and re-shelve the removed titles. And Plaintiffs' request that this Court preliminarily enjoin the District's elected board (along with its agents, attorneys, servants and other representatives) "from removing books from ESD libraries because of the ideas contained in the books," Pl. Mot. 30, would leave the District unable to make decisions regarding the curation of its school libraries until the end of this litigation. Every book contains ideas. It is precisely the role of a school board to determine which ideas are supportive of a school's educational mission.

## V.    The Public Interest Weighs Against A Preliminary Injunction

Finally, the public interest is in the District's favor at this preliminary stage. As argued above, it is uncontroversial that a District may remove titles from its libraries; the only potential limitation on this power is a removal for narrow, partisan reasons. To the extent Plaintiffs' claims are at all colorable, this Court will need to closely examine the specifics of the removal decision for each title before second-guessing the District's decision. *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems, and which do not directly and sharply implicate basic constitutional values."). The decision to remove the titles was the result of an open and public process undertaken by a duly elected school board. This is precisely how public bodies like the school board should deliberate matters of pedagogy and instruction. An injunction on these facts will encourage such decisions to be made out of the public eye and suppress community debate on the purpose of a school district's library collection.

## CONCLUSION

The plaintiffs' motion for preliminary injunction should be denied.

Dated: January 27, 2025

Respectfully submitted,

*s/ Christopher O. Murray*

Jonathan F. Mitchell
MITCHELL LAW PLLC
111 Congress Avenue, Suite 400
Austin, TX 78701
Telephone: (512) 686-3940
Email: jonathan@mitchell.law

Christopher O. Murray
Laura J. Ellis
Julian R. Ellis, Jr.
FIRST & FOURTEENTH PLLC
2 N. Cascade Avenue, Suite 1430
Colorado Springs, CO 80903
Telephone: (719) 286-2475
Emails: chris@first-fourteenth.com
        laura@first-fourteenth.com
        julian@first-fourteenth.com

Bryce D. Carlson
MILLER FARMER CARLSON LAW LLC
5665 Vessey Road
Colorado Springs, CO 80908
Telephone: (970) 744-0247
Email: bryce@millerfarmercarl-son.com

Michael Francisco
FIRST & FOURTEENTH PLLC
800 Connecticut Avenue, Suite 300
Washington, D.C. 20006
Telephone: (202) 784-0522
Email: michael@first-fourteenth.com

*Attorneys for Defendant*

31

## CERTIFICATE OF SERVICE

I certify that on January 27, 2025, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

may@wtotrial.com
lmoraff@aclu-co.org
sneel@aclu-co.org
tmacdonald@aclu-co.org
dec@wtotrial.com
whitt@wtotrial.com

_s/_
FIRST & FOURTEENTH PLLC