IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:24-cv-03512-CNS-STV

KRISTEN CROOKSHANKS, as parent and next of friend of a minor on behalf of C.C.;
MINDY SMITH, as parent and next of friend of a minor on behalf of E.S.;
NAACP–COLORADO–MONTANA–WYOMING STATE AREA CONFERENCES; and
THE AUTHORS GUILD,

      Plaintiffs,

v.

ELIZABETH SCHOOL DISTRICT,

      Defendant.

---

# ORDER

---

This is a book-removal case stemming from the Elizabeth School District (the District) in Elizabeth, Colorado. The District voted to permanently remove 19 books from its school libraries, including titles such as *The Kite Runner* and *The Bluest Eye*—books that had been in District libraries for years. Students of the District, parents of students, the local NAACP chapter, and authors of the removed books have challenged their removal on First Amendment grounds.

Before the Court is Plaintiffs' motion for preliminary injunction. ECF No. 9. Defendant responded, ECF No. 25, and Plaintiffs replied, ECF No. 28. Also pending is Defendant's motion to exclude Plaintiffs' proffered evidence supporting their preliminary injunction motion. ECF No. 27. Plaintiffs responded, ECF No. 30, and Defendant replied,

ECF No. 31. For the reasons explained below, the Court DENIES Defendant's motion to exclude, and it GRANTS Plaintiffs' motion for preliminary injunction. The District is ordered to immediately return the books to the library shelves, and it is enjoined from any conduct that violates this order.

## I. BACKGROUND

### A.    Removed Books

In August 2024, the Board of Education (the Board) for the District identified 19 books that it stated were too sensitive to be in the District's libraries.[1] ECF No. 25 at 7–9. The Board removed these books from the District's libraries and displayed them in the Board's office so that community members could weigh in on whether they thought the books should be returned to the District's libraries and added to the Sensitive List[2] or permanently removed from District libraries. *Id.* The Removed Books are:

(1)    *The Hate U Give* by Angie Thomas;
(2)    *Beloved* by Toni Morrison;
(3)    *The Bluest Eye* by Toni Morrison;
(4)    *The Kite Runner* by Khaled Hosseini;
(5)    *You Should See Me in a Crown* by Leah Johnson;
(6)    *#Pride: Championing LGBTQ Rights* by Rebecca Felix;
(7)    *George* (now published and referred to as *Melissa*) by Alex Gino;
(8)    *It's Your World—If You Don't Like It, Change It* by Mikki Halpin;
(9)    *The Perks of Being a Wallflower* by Stephen Chbosky;

---

[1] In referring to the Removed Books, the parties sometimes refer to 18 Removed Books, and in other places, they refer to 19 Removed Books. *Compare* ECF No. 1, ¶ 67 ("In total, eighteen books (the 'Removed Books') were taken out of ESD libraries."), *with* ¶ 190 ("The Elizabeth School District, acting through its Board, removed at least nineteen books from ESD libraries in a narrowly partisan or political manner because the Board disagrees with the ideas or views contained in those books."). It appears the District removed the nineteenth book—*Redwood and Ponytail*—a month after removing the first 18. ECF No. 9 at 10. For consistency, the Court will refer to the 19 books collectively as the Removed Books.

[2] A book's inclusion on the Sensitive List means that, if a student tries to check it out, their parents will automatically be notified. Parents can also prohibit their children from checking out all books on the Sensitive List. ECF No. 9 at 4.

(10)   *Thirteen Reasons Why* by Jay Asher;
(11)   *Looking for Alaska* by John Green,
(12)   *Nineteen Minutes* by Jodi Picoult;
(13)   *Crank* by Ellen Hopkins;
(14)   *Glass* by Ellen Hopkins;
(15)   *Fallout* by Ellen Hopkins;
(16)   *Identical* by Ellen Hopkins;
(17)   *Burned* by Ellen Hopkins;
(18)   *Smoke* by Ellen Hopkins; and
(19)   *Redwood and Ponytail* by K.A. Holt.

ECF No. 9 at 4. For 25 days, the Removed Books were displayed in the Board's office, with passages pre-marked in each book that the Board found troubling. *Id.* The Board provided forms that parents could fill out following review of a particular Removed Book. *Id.* The form provided two options: (1) "this book should be Returned to the library and listed on the sensitive topic list," or (2) "this book should be Removed from the library collection." *Id.* (citing ECF No. 9-8 (Elizabeth School District's Book Review Form)). There was no option on the form to return the books to school libraries and leave them off the Sensitive List. *Id.*

**B.   Plaintiffs**

Plaintiffs include current District students who intended to browse and check out the Removed Books from their school libraries but have not been able to do so since the Board removed them. ECF No. 9 at 10.

Plaintiff C.C. is a junior at Elizabeth High School who spends much of her free time reading and browsing books in the school library. *Id.* (citing C.C. Decl.). She states that she wants to check out the Removed Books from her school library but is unable to do so. *Id.* at 11.

3

Plaintiff E.S. is in preschool at Running Creek Elementary and uses the school's library to borrow books. *Id.* (citing Smith Decl.). His mother brings this action on his behalf, stating that she intends for E.S. and his younger sister to attend elementary, middle, and high school in the District and is concerned that her children are unable to read the Removed Books. *Id.*

Plaintiff NAACP - Colorado–Montana–Wyoming State Area Conference (NAACP) has members who are parents of students in the District who use their school library to discover new information and explore a wide array of ideas and viewpoints. *Id.* at 11–12 (citing Prescott Decl.). Like C.C., the parents state that their children intended to use the school library to access information about race, racism, LGBTQ history, gender identity, and other topics that are important to them. *Id.* at 12.

Finally, Plaintiff the Authors Guild includes authors whose books were removed from District libraries because, according to Plaintiffs, of the viewpoints expressed in the books. *Id.* Authors Guild member Ellen Hopkins wrote *Crank*, *Glass*, *Fallout*, *Identical*, *Burned*, and *Smoke* to help teenagers navigate difficult situations and express her views on the perils and realities of addiction, abuse, and promiscuity. *Id.* (citing Hopkins Decl.). Authors Guild member Angie Thomas wrote *The Hate U Give* to express her views on racism, police misconduct, and the value of teenagers using their voices to advocate for people and causes they care about. ECF No. 1, ¶¶ 81–82. Authors Guild member Alex Gino wrote *George* (now published and referred to as *Melissa*) which offers an authentic portrayal of a child navigating gender identity while addressing themes of courage, self-discovery, acceptance, and friendship. *Id.* (citing Gino Decl.). Authors Guild member John

Green wrote *Looking for Alaska* to express his views on loss, grief, and intimacy, and to share his views with teenagers who may be experiencing death and grief for the first time. ECF No. 1, ¶¶ 103–04. Authors Guild member Jodi Picoult wrote *Nineteen Minutes* to help young adults feel seen and express her views on the consequences of teasing and failing to stand up against bullying. *Id.*, ¶¶ 106–08. According to Plaintiffs, because the Board disagrees with these authors' viewpoints and worldviews, the authors believe that they can no longer share their views with District students. *Id.* at 13 (citing Hopkins Decl. and Gino Decl.).

### C.    Defendant Elizabeth School District

The District educates approximately 2,600 students across four traditional public schools. ECF No. 25 at 1. The District's schools includes Running Creek and Singing Hills Elementary Schools, Elizabeth Middle School, and Elizabeth High School. *Id.* Each of the District's four traditional public schools has its own library. *Id.* at 3.

The District is governed by a five-director Board of Education (the Board). The Board directors at the relevant time were Rhonda Olsen (President), Heather Booth (Vice President), Mary Powell (Secretary), Mike Calahan (Treasurer), and Jonathan Waller (Assistant Secretary/Treasurer). *Id.* Dan Snowberger is the District's superintendent and was unanimously appointed to the position by the Board on March 13, 2023. *Id.* at 2. Finally, Kim Moore is the District's Chief Academic Officer. *Id.* at 4 n.2.

## II.  PENDING MOTIONS

Plaintiffs seek a preliminary injunction requiring the Removed Books to be returned to District libraries and enjoining the Board from continuing to remove books because of

their disagreement with the ideas and viewpoints contained in the books. ECF No. 9 at 2.

In support of their motion, Plaintiffs provide the following:

- Declarations from C.C. Ms. Crookshanks, Ms. Smith, Ms. Prescott, Ms. Hopkins, and Alex Gino;

- District memorandum dated August 12, 2024, concerning "9.7 Library Sensitive Topic Protocol and Book Lists," which lists the 19 "Temporarily Suspended Books," and the various books on the "Sensitive Topic Draft Book List";

- The District's Book Review Form (blank and completed forms);

- Various emails between Superintendent Snowberger, Board directors, and other District employees; and

- Various emails between Board directors and interested citizens (e.g., graduates of the District, grandparents of District students, etc.).

The District objects to each of these exhibits and moves to exclude them. ECF No. 27. In the alternative, the District asks the Court to hold an evidentiary hearing—applying the Federal Rules of Evidence at this early stage—in resolving these objections.

### III.  LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes courts to enter preliminary injunctions and issue temporary restraining orders. Fed. R. Civ. P. 65(a)–(b). "District courts have discretion over whether to grant preliminary injunctions." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 796 (10th Cir. 2019). "A district court's decision crosses the abuse-of-discretion line if it rests on an erroneous legal conclusion or lacks a rational basis in the record." *Id.*

A party seeking preliminary injunctive relief must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence

of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *Petrella v. Brownback*, 787 F.3d 1242, 1257 (10th Cir. 2015). The movant must demonstrate that "all four of the equitable factors weigh in its favor," *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013), and the movant's "failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted." *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014). "Preliminary injunctions are extraordinary remedies requiring that the movant's right to relief be clear and unequivocal." *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018).

The Tenth Circuit specifically disfavors injunctions that will (1) alter the status quo, (2) mandate an affirmative act by the defendant, or (3) afford all the relief that the movant could expect to win at trial. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2004). A request for disfavored injunctive relief "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004).

## IV.  ANALYSIS

The Court first addresses the District's motion to exclude before turning to Plaintiffs' motion for preliminary injunction.

A.    **The District's Motion to Exclude Evidence (ECF No. 27)**

1.    *The District's Evidentiary Objections*

The District contends that Plaintiffs' proffered evidence is inadmissible for a variety

of reasons, but it primarily objects on hearsay grounds. The Court is not persuaded.

Even if the Federal Rules of Evidence applied at this stage (as explained below,

they do not), many of the District's objections are plainly baseless. For example, the

District objects to its own employees' and Board directors' emails as hearsay:

| | |
|---|---|
| Email from Superintendent Snowberger to Director Powell, dated August 5, 2024, and remainder of email thread. | Inadmissible hearsay. FRE 802. |
| Email from Director Booth to [redacted], dated August 19, 2024, and remainder of email thread (Same objection for Exhibit 11 & 12). | Inadmissible hearsay. FRE 802. |
| Email from Director Powell to Director Booth, dated September 8, 2024, and remainder of email thread. | Inadmissible hearsay. FRE 802. |
| Email from Director Powell to [redacted], dated September 8, 2024. | Inadmissible hearsay. FRE 802. |
| Email from Superintendent Snowberger to J. Maher, dated August 19, 2024. | Inadmissible hearsay. FRE 802. |
| Email from President-Director Olsen to Superintendent Snowberger and M. Seefried, dated September 5, 2024, and remainder of email thread. | Inadmissible hearsay. FRE 802. |
| Email from M. Seefried to Chief Academic Officer Moore, dated September 11, 2024. | Inadmissible hearsay. FRE 802. |
| Email from Chief Academic Officer Moore to P. Slade, dated September 10, 2024. | Inadmissible hearsay. FRE 802. |

ECF No. 27 at 19–23 (objections taken verbatim from the District's motion). Statements

by Superintendent Snowberger, Board directors, Chief Academic Officer Moore, and

other District employees are not hearsay; under Federal Rule of Evidence 801(d)(2)(D), these are opposing party statements that are excluded from the definition of hearsay.[3]

Moreover, Plaintiffs point out that many of their exhibits are not offered to establish the truth of the matter asserted. ECF No. 30 at 4. And they argue that the book review forms (even if they were being offered for the truth asserted in them) are business records under Rule 802(6). *Id.* at 4–5. The District ignores these arguments as well.

At its core, many of the District's objections lack any legal basis, and the Court does not anticipate the District raising similarly meritless objections in the future. However, a very small number of objections have merit. It is true that some of the exhibits not written by a District employee or Board director contain hearsay or otherwise may be speculative. Courts in this District, however, have held that "hearsay statements . . . are fair game" at the preliminary injunction stage. *EIS Ultimate Holding, LP v. Huset*, No. 23-CV-02324-GPG-MDB, 2024 WL 4472008, at *9 (D. Colo. Sept. 19, 2024) (citing *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees*, 680 F. Supp. 3d 1250, 1268 (D. Wyo. 2023) (observing that "a court may consider affidavits based on hearsay when evaluating requests of preliminary injunctions"), and *Shea v. Ditech Fin. LLC*, 208 F. Supp. 3d 380, 382 (D. Mass. 2016) ("The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction.")).

In sum, the Court overrules the District's evidentiary objections at this stage.

---

[3] That these are opposing party statements should have been obvious to the District's counsel. But even so, Plaintiffs raise this argument in their response, ECF No. 30 at 4, and Defendant abandons the argument by completely ignoring it in its reply.

### 2.    The District's Request for an Evidentiary Hearing

The District, in the alternative, asks the Court to hold an evidentiary hearing on Plaintiffs' proffered evidence applying the Federal Rules of Evidence. The Court declines to do so for at least four reasons.

First, Tenth Circuit caselaw is clear on this issue: "The Federal Rules of Evidence do not apply to preliminary injunction hearings." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("We must be mindful, therefore, as the Supreme Court has cautioned, that 'a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'" (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981))). If the Court granted the District's request, it would need to delay a ruling on Plaintiffs' preliminary injunction motion while the parties prepared their various witnesses and then hold a multiday hearing. In addition to the delay, such a hearing would amount to a trial on the merits—something the Tenth Circuit has counseled against. *See id.* ("[I]t bears remembering the obvious: that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits."). Applying these elementary principles leads to one conclusion: the District's request to hold an evidentiary hearing and apply the Federal Rules of Evidence at this stage would be improper.

Second, as will be seen below in granting Plaintiff's preliminary injunction motion, the Court largely relies on the District's own statements in determining that Plaintiffs are likely to succeed on the merits. The Court has already explained why the District's

hearsay objections to these statements are baseless, and thus an evidentiary hearing on these statements would be a waste of time.[4]

Third, in its reply, the District goes far beyond the bounds of what it argued in its motion to exclude (and what Plaintiffs addressed in their response brief). Take, for example, the District's contention that Plaintiffs are seeking a mandatory injunction, and thus arguing that the application of the Federal Rules of Evidence is heightened here. ECF No. 31 at 4. This is the first time the District raises this issue, which is curious because Plaintiffs make clear in their preliminary injunction motion that they "seek a preliminary injunction in order to preserve the status quo—when all of the Removed Books were available in ESD libraries." ECF No. 9 at 14. It is Plaintiffs' position that, because their motion merely seeks to return the Removed Books to District libraries, "the preliminary injunction in this case does not require defendant[] to do something that they were not doing during the last uncontested period." *Id.* (quoting *Evans v. Fogarty*, 44 F. App'x. 924, 928 (10th Cir. 2002)). Defendant does not address this issue at all in its response, ECF No. 25, nor in its motion to exclude, ECF No. 27. Thus, arguing a new issue in a reply separate and apart from the preliminary injunction briefing is improper.

Fourth, the District makes factually incorrect statements in its reply brief. For example, the District mischaracterizes the evidence Plaintiffs rely on as simply the statements by "parents of two students, the head of the local NAACP chapter, and select members of another trade group," and "not of the School Board members." ECF No. 31

---

[4] The Court may have reached a different conclusion had the District objected on foundation or authenticity grounds, but it did not—it only objected on hearsay grounds.

at 1. Not so. Plaintiffs cite countless statements from Board directors throughout their preliminary injunction motion. *See* ECF No. 9 (extensively citing statements from the Board President, Vice President, Secretary, Treasurer, and Assistant Secretary/Treasurer).

To be sure, the District's argument for an evidentiary hearing has some support: "most courts hold that when the written evidence reveals a factual dispute, an evidentiary hearing must be provided[.]" Wright & Miller, *Federal Practice & Procedure*, § 2949 Procedure on Application for Preliminary Injunction (3d ed.) (citing cases from the Eleventh Circuit and others but not the Tenth Circuit). However, whether "the facts are bitterly contested," *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1211 (11th Cir. 2003), is not so obvious here. On one hand, the District is not disputing that the books were removed from the library shelves. On the other, the District's motivation for removing the books is in dispute. The latter appears to go to the merits of the dispute and not the underlying facts. Or said a bit differently, the key underlying facts here are not bitterly contested.

Further, in the more recent cases, the factual dispute was more germane to the injunctive relief. In *Moon v. Med. Tech. Assocs., Inc.*, 577 F. App'x 934 (11th Cir. 2014), for example, the issue was whether former employees were violating restrictive covenants in an employment agreement.

> To reach its conclusion in [granting the preliminary injunction], the district court made extensive factual findings. In fact, the district court's order—which [the defendant] drafted—includes almost five pages of factual findings. However, many of these facts are disputed by the parties' conflicting affidavits. For example, *the Plaintiffs dispute whether they competed in the*

> restricted area, whether they solicited [the defendant's]
> customers, and whether [the defendant's] customer
> relationships were substantial.

*Id.* at 939 (emphasis added and internal citations omitted). In the Court's view, the factual

disputes highlighted by the Eleventh Circuit in *Moon* are plainly distinguishable from the

facts of this case.

Similarly, in *Four Seasons Hotels And Resorts, B.V. v. Consorcio Barr, S.A.*, Four

Seasons accused the defendant of gaining unauthorized access to the Four Seasons

computer network and thus proprietary and confidential materials located on the network.

320 F.3d 1205, 1208 (11th Cir. 2003). The Four Seasons filed an emergency motion for

an ex parte temporary restraining order, seeking to prevent the defendant from accessing

its computer network. *Id.* The district court granted the preliminary injunction. *Id.* The

Eleventh Circuit faulted the district court for not holding an evidentiary hearing when the

"facts surrounding the alleged unauthorized computer use [were] in dispute." *Id.* As with

*Moon*, the Court finds the factual dispute in *Four Seasons* distinguishable from the instant

case because here, there is no dispute that the District has removed the books from the

libraries.

\* \* \*

Because the Federal Rules of Evidence do not apply at this stage, the District's

motion to exclude is denied.

**B.     Plaintiffs' Motion for Preliminary Injunction (ECF No. 9)**

The Court has reviewed Plaintiffs' motion and reply, the District's response, and
the various exhibits and affidavits attached to the parties' briefings. ECF Nos. 9, 25, 28.
The Court considers the four requirements governing a preliminary injunction below and
concludes that Plaintiffs have satisfied their burden of showing that a preliminary
injunction is warranted.

*1.     Likelihood of Success on the Merits*

Before a court may issue a preliminary injunction, the movant must establish a
substantial likelihood of prevailing on the merits of its claims. *Prairie Band of Potawatomi
Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001). However, "the determination of
a motion for a preliminary injunction and a decision on the merits are different." *Valdez v.
Applegate*, 616 F.2d 570, 572 (10th Cir. 1980).

*a.     Status Quo*

As an initial matter, Plaintiffs argue that they "seek a preliminary injunction in order
to preserve the status quo—when all of the Removed Books were available in ESD
libraries." ECF No. 9 at 13. Thus, according to Plaintiffs, this is not a disfavored injunction
that requires them to satisfy a higher burden. *Id.* The District does not respond to this
argument. *See generally* ECF No. 25.

"To determine whether an injunction is mandatory or prohibitory, [courts] look at
the substance of the injunction and compare it to the status quo ante—i.e., the 'last
uncontested period preceding the injunction.'" *Evans*, 44 F. App'x at 928–29 (quoting
*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir.

2001)). In *Dominion Video*, the Tenth Circuit held that a preliminary injunction requiring the defendant to take affirmative action to activate satellite television subscribers was not mandatory. 269 F.3d at 1155 ("EchoStar asserts that the injunction forces it to take affirmative action to activate new Dominion subscribers. The injunction, however, prohibits EchoStar from refusing to activate new Dominion customers on the same terms and conditions previously applicable."). The court explained that the requested injunction did "not compel [the defendant] to do something it was not already doing during the last uncontested period preceding the injunction." *Id.*

The Court finds that Plaintiffs' requested relief is not a disfavored injunction. First, the District offers no response to this argument and thus waived its opposition. Second, as in *Dominion Video,* Plaintiffs' requested injunction does not require the District to do something that it was not already doing during the last uncontested period—return the Removed Books to the District libraries' shelves so that students can peruse them and borrow them if desired. Third, a preliminary injunction during the pendency of these proceedings will not provide substantially all the relief to which Plaintiffs may be entitled. *See* ECF No. 1 at 45–47 (seeking permanent injunction, past and future pecuniary and non-pecuniary losses, declaratory relief, and attorney fees).

For these three reasons, the heightened burden for mandatory injunctions does not apply.

b.    *First Amendment Rights at Stake*

Plaintiffs argue that the students' interest in accessing books in their respective school libraries is constitutionally protected. ECF No. 9 at 14–21. The District disagrees,

15

arguing that the District library curation decisions are government speech immune from First Amendment scrutiny. ECF No. 25 at 12. Caselaw does not support the District's position, and therefore, the Court agrees with Plaintiffs.

The First Amendment of the U.S. Constitution and Article II, Section 10 of the Colorado Constitution protect the right to receive information and ideas.[5] *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas. This freedom (of speech and press) . . . necessarily protects the right to receive . . . . This right to receive information and ideas, regardless of their social worth, is fundamental to our free society." (internal citations and quotations omitted)); *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1051, 1054 (Colo.), *as modified on denial of reh'g* (Apr. 29, 2002) (the "First Amendment to the United States Constitution protects . . . the right to receive information and ideas," and that right is extended under the Colorado Constitution, which "provides broader free speech protections than the Federal Constitution"). This protection is heightened in public schools. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

The District's argument—that its decisions as to the library contents are government speech immune from First Amendment scrutiny—finds little support in the

---

[5] Section 10 of the Colorado Constitution is titled *Freedom of Speech and Press* and provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact."

caselaw. Courts generally hold that the placement and removal of books in public school libraries is <u>not</u> government speech. *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024) ("Contrary to Defendants' contention, the Supreme Court has not extended the government speech doctrine to the placement and removal of books in public school libraries."); *id.* at 668 ("[I]t is doubtful that the public would view the placement and removal of books in public school libraries as the government speaking."). This makes sense.

Take, for example, a high school library that includes Hitler's manifesto *Mein Kampf*. No one would seriously argue that placing this book in a school library constitutes government speech. *See id.*; *see also PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) ("[T]the fact that the traditional purpose of a library is to provide information on a broad range of subjects and viewpoints, the Court simply fails to see how any reasonable person would view the contents of the school library (or any library for that matter) as the government's endorsement of the views expressed in the books on the library's shelves."); *id.* (distinguishing cases cited by the school "because the speech embodied in a library collection is materially different from the speech embodied in government-sponsored parades, prayers, art exhibits, and monuments on public property"); *Virden v. Crawford Cnty., Arkansas*, No. 2:23-CV-2071, 2024 WL 4360495, at *5 (W.D. Ark. Sept. 30, 2024) ("[T]he Supreme Court has not extended [the government speech] doctrine to the placement and removal of books in libraries.").

The District also relies on *Moody v. NetChoice, LLC* for the proposition that "expressive activity includes presenting a curated compilation of speech originally created by others." 603 U.S. 707, 728 (2024). To be sure, *NetChoice* held that the "First Amendment offers protection when an entity engaging in expressive activity, *including compiling and curating others' speech*, is directed to accommodate messages it would prefer to exclude." *Id.* at 731 (emphasis added). Or stated in another way, an "entity 'exercis[ing] editorial discretion in the selection and presentation' of content is 'engage[d] in speech activity.'" *Id.* (quoting *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)). Although compelling, the Court is not persuaded that *NetChoice* requires a different outcome. *NetChoice* had nothing to do with government speech—it concerned states' power to control whether and how third-party social-media posts are presented to other users. *Id.* at 717.

The Court rejects the District's invitation to extend government-speech precedents by applying *NetChoice* or its other cited authority to the facts at hand—something the Supreme Court has expressly discouraged. *Matal v. Tam*, 582 U.S. 218, 235 (2017) ("[W]hile the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse. If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints. For this reason, *we must exercise great caution before extending our government-speech precedents*." (emphasis added)).

The Court holds that it is Plaintiffs' First Amendment rights at stake—not the District's.

### c.    Plaintiff-Authors' First Amendment Rights

Plaintiffs argue that the District violated the Authors Guild Plaintiffs' constitutional right to share their books free from undue viewpoint-based censorship. ECF No. 9 at 21–25. The District offers no response to this narrow argument. Regardless, the Court agrees with Plaintiffs.

Authors have a right to share their books and ideas, and this right is protected under the First Amendment. *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943) ("The right of freedom of speech and press has broad scope. The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance. *This freedom embraces the right to distribute literature, and necessarily protects the right to receive it*." (internal citation omitted and emphasis added)); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) ("The constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication, and the direct and obviously intended result of the Commission's activities was to curtail the circulation in Rhode Island of books published by appellants." (internal citation omitted)).

### d.    Whether the District's Book Removal Violated the Students' First Amendment Rights

The District first argues that Plaintiffs have not made a clear showing of likely success on the merits because a school library's curation decisions are government

speech immune from First Amendment scrutiny. ECF No. 25 at 12. The Court has already rejected that argument. But the District goes on, arguing that, even if the District's curation decisions are not government speech, the three-justice plurality opinion in *Pico* on which Plaintiffs rely is nonprecedential and doctrinally stale. *Id.* at 13. Instead, the District argues that the Court must proceed under the rubric for curricular-related speech established in *Hazelwood*. *Id.* The Court addresses the *Pico* and *Hazelwood* decisions in turn and then analyzes whether Plaintiffs are likely to succeed on the merits under both frameworks.

*i.*    *Supreme Court's* Pico *Decision*

Plaintiffs rely on the plurality opinion of Justice Brennan in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982). The case involved a school district's decision to remove nine books from the school library. *Id.* at 856. *Pico*, however, produced seven opinions, none of which garnered a majority.

Justice Brennen announced the judgment of the court in a plurality joined by Justices Marshall and Stevens. *Pico*, 457 U.S. at 855. The plurality held that school boards "may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion,'" *Id.* at 872 (quoting *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

Justice Blackmun joined in the plurality with the exception of one part and wrote separately to clarify his First Amendment analysis. *Id.* at 875. Justice Blackmun disagreed with the plurality's assertion that school children have a "right to receive information." *Id.* at 87–79. He instead focused on the state's denial of access to ideas. *Id.* at 879 n.2 ("In

effect, my view presents the obverse of the plurality's analysis: while the plurality focuses on the failure to provide information, *I find crucial the State's decision to single out an idea for disapproval and then deny access to it*." (emphasis added)). In Justice Blackmun's view, the Court should hold that "school officials may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved." *Id.* at 879–80 ("It does not seem radical to suggest that state action calculated to suppress novel ideas or concepts is fundamentally antithetical to the values of the First Amendment. At a minimum, allowing a school board to engage in such conduct hardly teaches children to respect the diversity of ideas that is fundamental to the American system."). The school board must "be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 880 (quoting *Tinker*, 393 U.S. at 509).

Justice White concurred in the judgment but favored delaying the announcement of a legal rule until the trial court established the reasons behind the school officials' decision to remove the books. *Id.* at 883. He did not reveal what standard he would use in judging the constitutionality of a school board's decision to remove certain books from school libraries.

It is well-established that a plurality opinion is not binding on this Court. *United States v. Friedman*, 528 F.2d 784, 788 (10th Cir. 1976) ("A mere plurality pronouncement of this type does not have the binding effect that [the defendant] argues for. A trial court does not necessarily err when it does not follow a rule promulgated by only three Justices

of the Supreme Court."), *vacated on other grounds*, 430 U.S. 925 (1977). Because *Pico*

failed to announce a legal rule blessed by five justices, the precedential value of *Pico* has

perplexed courts for years, including in the recent years. *PEN Am. Ctr.*, 711 F. Supp. 3d

at 1331 ("The applicable legal standard for evaluating alleged First Amendment violations

in the school library context is not entirely clear . . . .").

Thirty years ago, a district court in this Circuit observed that,

> *[w]hat clearly emerges from the Pico decision is that the trial
> court must determine the motivation of the school officials in
> removing the book. Five of the justices in Pico agreed that
> some motivations would be unconstitutional.* The plurality
> found the motivations unconstitutional if school officials
> "intended by their removal decision to deny respondents
> access to ideas with which [the officials] disagreed, and if this
> intent was the decisive factor in [the removal] decision." *Pico,*
> 457 U.S. at 871. Removal may be permissible if based on
> vulgarity or "educational suitability." *Id.*

*Case v. Unified Sch. Dist. No. 233, Johnson Cnty., Kan.*, 895 F. Supp. 1463, 1468–69 (D.

Kan. 1995) (emphasis added). Thus, according to *Case*, *Pico* "must be used as a starting

point," as this is the "only Supreme Court decision dealing specifically with removal of

books from a public school library." *Id.* at 1469; *see also Campbell v. St. Tammany Par.

Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995) ("Even though the constitutional analysis in the

*Pico* plurality opinion does not constitute binding precedent, it may properly serve as

guidance in determining whether the School Board's removal decision was based on

unconstitutional motives. . . . [The Fifth Circuit has never suggested] that the *Pico* plurality

does not provide useful guidance in determining the constitutional implications of

removing books from a public school library."); *PEN Am. Ctr.*, 711 F. Supp. 3d at 1331

(stating that the "common theme" in all of the potentially relevant First Amendment school-

library cases "(e.g., *Pico* plurality, *Hazelwood*, nonpublic forum) is that school officials
cannot remove books solely because they disagree with the views expressed in the books
but that they can make content-based removal decisions based on legitimate pedagogical
concerns . . .").

The District asks the Court to ignore the *Pico* plurality because, under *Marks v.
United States*, 430 U.S. 188, 193 (1977),[6] the controlling opinion belongs to Justice White,
who concurred in the judgment but did not join any portion of Justice Brennan's plurality
opinion. ECF No. 25 at 15 (citing *Campbell*, 64 F.3d at 189) ("Justice White's concurrence
in *Pico* represents the narrowest grounds for the result in that case.")). That may be true,
but the District ignores that *Campbell* and other courts have decided that *Pico* still
provides useful guidance in book-removal cases. *Campbell*, 64 F.3d at 189 (*Pico* "may
properly serve as guidance in determining whether the School Board's removal decision
was based on unconstitutional motives").

The District goes on to copy the bulk of Justice White's concurrence, ECF No. 25
at 16, but it omits a key portion of the short concurrence: Justice White preferred to return
the case to the district court to determine why the school board removed the books. *Pico*,
457 U.S. at 883 ("When findings of fact and conclusions of law are made by the District
Court, that may end the case. If, for example, the District Court concludes after a trial that
the books were removed for their vulgarity, there may be no appeal."). If Justice White
was "entirely agnostic on whether the First Amendment imposes *any* constraints on book-

---

[6] *Marks* instructed that, when "a fragmented Court decides a case and no single rationale explaining the
result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by
those Members who concurred in the judgment[ ] on the narrowest grounds." 430 U.S. at 193 (quoting
*Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

removal decisions made by public-school libraries" as the District argues, ECF No. 25 at 16, his preference to remand the case for further factfinding on the school board's motivations would be pointless.

Like the cases outlined above, the Court finds that *Pico* remains a useful starting point in determining the constitutionality of the District's book-removal decision.

### ii.     Supreme Court's *Hazelwood Decision*

The District argues that the Court should defer to the Board's book-removal decision under *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260 (1988). ECF No. 25 (arguing that *Hazelwood* bars Plaintiffs' claims because school boards have "maximum deference over curricular and school-sponsored speech"). There, the Supreme Court held that school districts are entitled to exercise broad discretion in the management of curricular affairs "so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. *Hazelwood* concerned a school official's "editorial control over the contents of a high school newspaper produced as part of the school's journalism curriculum." *Id.* at 262. The Court held that school officials may exercise greater control over student expression that is a part of the school curriculum. *Id.* at 270–72.

The Tenth Circuit has cautioned courts not to read *Hazelwood* too narrowly by applying it only to activities conducted as part of the traditional school curriculum. *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 924 (10th Cir. 2002). The *Fleming* court read the definition of "school-sponsored" speech to mean "activities that might reasonably

be perceived to bear the imprimatur of the school and that involve pedagogical concerns."

*Id*.

> If the speech at issue bears the imprimatur of the school and involves pedagogical interests, then it is school-sponsored speech, and the school may impose restrictions on it so long as those restrictions are reasonably related to legitimate pedagogical concerns. The imprimatur concept covers speech that is so closely connected to the school that it appears the school is somehow sponsoring the speech.

*Id*. at 924–25. *Fleming* further counsels that the "level of involvement of school officials in organizing and supervising an event affects whether that activity bears the school's imprimatur." *Id.* at 925.

### iii.    Plaintiffs are Likely to Succeed Under Either Standard

Regardless of the standard the Court applies, the Court finds that Plaintiffs are likely to succeed on the merits of their claims.

Under the *Pico* framework, the Court looks to the District's stated motivations behind removing the 19 books. Plaintiffs argue that the District's motives were clear: the District removed the books based on the authors' and books' viewpoints and political ideologies. Plaintiffs point to emails and public statements from Board directors and other District employees. The Court highlights some of those below—concluding that the District's decisive factor in voting to permanently banish the Removed Books was because the District disagreed with the views expressed in the books and to further their preferred political orthodoxy.

First, in emails between the Board directors and Superintendent Snowberger, Director Heather Booth commented, "[w]e need to be cautious about the way we frame

our stance on politics in our schools. While I completely agree that we must keep politics out of the classroom and shield our students from partisan influences, *it's equally important to remember that our commitment to conservative values was a key aspect of our campaign*." ECF No. 9-9 at 3 (emphasis added). She went on to write,

> It's crucial that as we navigate these discussions, we remain mindful of the promises we made and the values we pledged to support. By doing so, we can maintain our integrity and ensure that our actions align with the expectations of those who elected us. As I like to say "we need to keep politics out of the classroom and away from the kids". *However conservative values are exactly what we are and plan to continue to bring into the district.*

*Id.* (emphasis added). In response, Superintendent Snowberger stated, "I'm not opposed to the change, Heather. This has been what we've spoken about since I've been hired so it's just important that I know how the board wants to frame this. I certainly will take the boards direction." *Id.* at 2. President-Director Rhonda Olsen then responded to the group stating, "Our vision for the district could be considered by some to be conservative based. We were very vocal about getting a superintendent and legal representation with conservative values . . . ." *Id.*

Second, in an email between Director Booth and a graduate of the District, Director Booth justified the book removal, stating that, "[a]s an elected official committed to conservative values for our children, I feel a strong obligation to honor the promises made during my campaign." ECF No. 9-10 at 2  (copying the entire Board).

Third, in a back-and-forth between Director Mary Powell and Director Booth, Director Powell explains why she waffled on whether *#Pride - Championing LGBTQ*

*Rights* and *You Should See me in a Crown* should be removed or just marked sensitive.

ECF No. 9-12 at 3–4.

> I voted "Move to Sensitive List and move up to EHS" on #Pride because this book is largely a history of LGBTQ, and doesn't totally try to indoctrinate. But, just the overall topic is going to tend to that regardless. *I also thought it would be a good thing to show some openness to other viewpoints*, as long as it isn't indoctrinating.
>
> I voted same on "Crown" because while it has some racist overtones, they are just the main character handling them. About halfway through you find out she is a lesbian. There is another prom contestant who is also, and they form a relationship. There isn't anything graphic other than discussing a kiss that I saw, and it is not the central theme of the book at all. I thought the story was overall a good one of empowerment for black students - this is a very successful girl. There is also some good general friend support, etc. in the story.
>
> So, that is my reasoning, and Jon and Mike joined me in that vote. HOWEVER, if you and Rhonda strongly feel they should be REMOVED, I will change my vote on these two to REMOVE.

*Id.* (emphasis added). Director Booth responded, "[p]ersonally, LGBTQ is only regarding sexual preference which doesn't belong in any school. . . . Our constituents will not be happy about us returning any of these books. That is who we are beholden to." *Id.* Director Powell then responded, with Superintendent Snowberger and others copied, stating that she and President-Director Olsen "talked, and I have changed my vote on these two to REMOVE. I talked to both Jon and Mike and they also agree on REMOVE. *Therefore, all board votes for the 18 books are to REMOVE.*" *Id.* at 2 (emphasis added).[7]

---

[7] The District attempts to distance itself from Director Booth, stating that she resigned from the Board on January 13, 2025, and did not vote to permanently remove books from the library. ECF No. 25 at 1 n.1, 8

Fourth, Director Powell emailed an unknown recipient stating that she supported removing "the LGBTQ book and [] You should see me in a Crown." ECF No. 14 at 2. Convinced by Directors Booth and Olsen, Director Powell justified these removals because "they both have gender identity ideology in them, and do we really want that out there at all?" *Id.*

Fifth, a parent of a District student emailed President-Director Olsen complaining about *Redwood and Ponytail* by K.A. Holt. ECF No. 9-16 at 2–3. The parent's chief complaint was about the book's LGBTQ content. *Id.* Copying Superintendent Snowberger, Ms. Olsen responded, "[t]hank you so much for bringing this to our attention. The review of the library books to ensure age appropriate content is a new process for the district and we really appreciate it when parents bring to our attention any items that may have been missed. I will request that the book be removed from the library for further review." *Id.* at 2.

These five examples strongly suggest that the District's motivations behind removing the 19 books is blatantly unconstitutional under *Pico* and other precedents.[8] *See Pico*, 457 U.S. at 872 (school boards "may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their

---

n.7, 26 n.12. But the Board voted on September 9, 2024, to "permanently remove" the books. *Id.* at 8. Thus, even if Director Booth missed the September 9, 2024 meeting, she was still on the Board, and, even assuming that she did not vote (her correspondence suggests otherwise), her emails makes clear which way she intended to vote, and President-Director Olsen appeared to acknowledge Director Booth's "remove" vote.

[8] Plaintiffs also cite several statements from publicly held board meetings attacking the content and views expressed in the Removed Books that easily could be characterized as political and partisan in nature. *See, e.g.*, ECF No. 9 at 3 nn.3, 8 n.4–6, 19 nn.7–10, 23 n.12 (Vice President Booth stated that the Board was instituting its new book protocols because the current Board members were elected "on these values to keep your (the majority) values in mind of this community, and that is what we are going to do").

removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion'" (quoting *Barnette*, 319 U.S. at 642)) (Brennen, J. plurality opinion); *Campbell*, 64 F.3d at 189 (Fifth Circuit finding that *Pico* "may properly serve as guidance in determining whether the School Board's removal decision was based on unconstitutional motives"); *PEN Am. Ctr.*, 711 F. Supp. 3d at 1331 (Supreme Court precedent in *Pico* and *Hazelwood* is that "school officials cannot remove books solely because they disagree with the views expressed in the books").

The District's conclusory argument that it "easily satisfies" the *Pico* plurality standard "because it is not withholding access to the titles at issue for narrowly partisan or political reasons," ECF No. 25 at 13, is belied by the District's stated reasons in these five examples and during live Board meetings. Moreover, the District argues that schools need flexibility to fulfill their educational mission. *Id.* at 20. But the Board has made clear that they are acting to fulfill the pledge to carry out their conservative agenda—not an educational mission.

The District next argues that it removed some of the books not to prescribe partisan orthodoxy but because they contain "sexually explicit and vulgar content." ECF No. 25 at 27. But again, the contemporaneous statements expressly state otherwise. For example, Secretary Powell explained to the Board directors that in *You Should See Me in a Crown*, "[t]here isn't anything graphic other than discussing a kiss that I saw." ECF No. 9-12 at 3. And she explained that *#Pride: Championing LGBTQ Rights* "is largely a history of LGBTQ, and doesn't totally try to indoctrinate. . . . I also thought it would be a good thing to show some *openness to other viewpoints*, as long as it isn't indoctrinating." *Id.*

29

(emphasis added). Still, the Board—including Secretary Powell—voted to remove these books because of the viewpoints expressed in the books. At this stage, the Court puts much more weight on the contemporaneous statements made by the Board than it does on the after-the-fact declarations prepared with counsel's advice.[9]

For example, President-Director Olsen states that "I did not vote to remove any of the 19 disputed titles from the school district's libraries because of the 'ideas,' 'viewpoints,' or 'worldviews' contained or expressed in any of those books." ECF No. 25-3, ¶ 14. In light of the various emails and statements before the Court, the Court finds that her and the other directors' *post hoc* justifications plainly are pretextual. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292–93 (10th Cir. 2004) ("Although we do not second-guess the pedagogical wisdom or efficacy of an educator's goal, we would be abdicating our judicial duty if we failed to investigate whether the educational goal or pedagogical concern was pretextual. . . . [W]e may override an educator's judgment where the proffered goal or methodology was a sham pretext for an impermissible ulterior motive.").

The District also suggests that Plaintiffs cannot prevail because it allowed parents to weigh in on Removed Books. ECF No. 25 at 26. This argument does not help the District. First, the Board pre-selected and highlighted alleged inappropriate content in the books. True, many parents completed forms indicating that they wanted the books to be removed because the views expressed in the books did not align with their partisan,

---

[9] *See Fairbanks Cap. Corp. v. Kenney*, 303 F. Supp. 2d 583, 588 (D. Md. 2003) (a district court "must weigh and evaluate the evidence" when ruling on a preliminary injunction); *Devan Designs, Inc. v. Palliser Furniture Corp.*, No. 2:91CV00512, 1993 WL 283256, at *2 (M.D.N.C. Apr. 21, 1993) ("In the context of preliminary injunction, the court necessarily must weigh the evidence in order to determine the likelihood of success on the merits. In the context of summary judgment, such weighing of evidence is, of course, impermissible.").

political viewpoints.[10] For example, one parent of a high school student wrote that *#Pride* should be removed because "LGBTQ themes do not belong in our public schools." ECF No. 9-13 at 1. And a middle school parent wrote that "middle school students are too young to be exposed to the pride movement, same sex marriage, stonewall riots and pride parades." *Id.* at 3. Others commented that *You Should See Me in a Crown* should be removed "because of it[]s CRT [critical race theory] undertones and homosexual storyline." *Id.* at 10.

That parents want to remove books for partisan reasons does not permit government officials to do the same. *See, e.g.*, *Pico*, 457 U.S. at 872. Even assuming, as the District suggests, that the majority of parents wish to remove certain books based on their conservative beliefs, the First Amendment "offers sweeping protection" for those authors and readers who may adhere to the minority view. "In fact, it is the minority view, including expressive behavior that is deemed distasteful and highly offensive to the vast majority of people, that most often needs protection under the First Amendment." *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 243 (6th Cir. 2015) (collecting Supreme Court cases including *Brandenburg v. Ohio,* 395 U.S. 444, 447 (1969) (recognizing the First Amendment rights of Ku Klux Klan members to advocate for white supremacy-based political reform achieved through violent means) and *Texas v. Johnson,* 491 U.S. 397, 405–06 (1989) (recognizing flag burning as a form of political expression protected by the First Amendment)). "Any other rule 'would effectively empower a majority to silence

---

[10] Of course, parents also argued the opposite: that books should be returned to the book shelves. *See, e.g.*, ECF No. 9-13 at 22 (arguing that the book removal is "not welcoming to anyone who is not white, straight, and politically conservative").

dissidents simply as a matter of personal predilections,' and the government might be inclined to 'regulate' offensive speech as 'a convenient guise for banning the expression of unpopular views.'" *Id.* (quoting *Cohen v. California,* 403 U.S. 15, 21, 26 (1971)).

The District's arguments under the *Hazelwood* standard fall short as well. *Hazelwood* asks whether the activity at issue "might reasonably be perceived to bear the imprimatur of the school and that involve pedagogical concerns." *Fleming*, 298 F.3d at 924. If it does, then the speech is "school-sponsored speech" that may be immune from First Amendment scrutiny. *Id.*; *see generally Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). The District cannot make this showing.

To start, the District has provided no persuasive authority that merely maintaining a book on a school library shelf constitutes school-sponsored speech. "The imprimatur concept covers speech that is so closely connected to the school that it appears the school is somehow sponsoring the speech." *Id.* at 925. Given the District's stated position concerning the Removed Books, there is no chance that anyone will connect the views expressed in the Removed Books to the District. Stated a tad bit differently, no reasonable person would assume that the District is sponsoring the speech or views contained in the Removed Books.

Further, the District's book-removal decision is not "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273. Again, the District's conclusory argument that the Board's removal decisions here "easily clear the reasonable relation to a legitimate pedagogical concern" bar, and that "no Board director voted to remove any of the 18 books based on the viewpoint expressed therein," ECF No. 25 at 9, 20, is plainly

contradicted by the District's own statements. Other than pretextual declarations, at this stage, there simply is no reason to believe that the books were removed because of vulgarity, age-inappropriateness, or for legitimate pedagogical concerns; the Board's own emails strongly suggest that the book removal was motivated by the directors' "commitment to conservative values." The Court questions what could be more partisan or political than removing books to further the Board's self-described conservative values. The District cites no authority suggesting that a school board may remove books to further their political orthodoxy—something the *Pico* plurality expressly said not to do. *Pico,* 457 U.S. at 870 (school boards "rightly possess significant discretion to determine the content of their school libraries . . . [b]ut that discretion may not be exercised in a narrowly partisan or political manner").

The facts of *Hazelwood* and *Fleming* also are plainly distinguishable. *Hazelwood* involved the regulation of speech in a high school newspaper that was published by students *in a journalism class*. *Hazelwood*, 484 U.S. at 264. No reasonable person would dispute that a school newspaper published in a journalism class and supervised by a journalism teacher is part of a school curriculum—making it fundamentally different than a book in a school library. *Id.* at 271 (indicating that school curriculum activities extent to "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school . . . whether or not they occur in a traditional classroom setting").

And *Fleming* involved a teacher-initiated and school-sponsored project where, following the Columbine school shooting, the high school invited students to paint tiles to

install in the halls of the school. *Fleming*, 298 F.3d at 920. The Tenth Circuit found that the tiles bore the school's imprimatur given the school's involvement in the project. *Id.* at 931. A library book, however, bears no such imprimatur. Unlike in *Fleming*, there is little to no "level of involvement of school officials." The District even suggests that it was unaware that some of these books had resided in their libraries for years, ECF No. 25 at 3, strongly indicating that maintaining books in a school library is not part of the District's curriculum.

* * *

In sum, Plaintiffs have shown that the District removed the 19 books based on the authors' and books' content and viewpoints on issues such as race, sexual orientation, gender identity, LGBTQ content, and to promote the Board's self-proclaimed "conservative values." This finding is especially true with respect to Plaintiffs' allegations under the Colorado Constitution. The District focuses entirely on the federal Constitution but completely ignores Plaintiffs' argument that they are likely to succeed under both the First Amendment of the United States Constitution and Article II, Section 10 of the Colorado Constitution. As previously noted, the Colorado Supreme Court has consistently afforded broader First Amendment protections under the Colorado Constitution. *Tattered Cover*, 44 P.3d at 1054 ("[O]ur state constitution provides more expansive protection of speech rights than provided by the First Amendment.").

At this stage, the Court must conclude that the District's "decisive factor" in removing the books was "because it found them objectionable in content and because it felt that it had the power, unfettered by the First Amendment, to censor the school library

for subject matter which the Board members found distasteful." *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) (further pointing out that neither the state nor the school board "was under any federal constitutional compulsion to provide a library for the [s]chool or to choose any particular books," but once "having created such a privilege for the benefit of its students, however, neither body could place conditions on the use of the library which were related solely to the social or political tastes of school board members"). It is unconstitutional—under both the federal and Colorado Constitutions—to remove books from a school library merely because the District "disagree[s] with the views expressed in the books."[11] *PEN Am. Ctr.*, 711 F. Supp. 3d at 1331. Such ideological justifications for removal fail under all the potentially relevant First Amendment standards. It remains to be seen whether Plaintiffs will be able to prove their allegations with respect to each of the challenged books at trial, but at the preliminary injunction stage, Plaintiffs have satisfied their burden of showing that they are likely to succeed on the merits of their claims.[12]

---

[11] The Court's ruling does not prohibit the District from removing books based on legitimate pedagogical concerns. *See PEN Am. Ctr.*, 711 F. Supp. 3d at 1331. As the District rightly argues, a school board could remove a collection of *Playboy* magazines in a school library (although it is hard to imagine *Playboys* ever reaching a public school library) and likely could remove a collection of books "promoting frauds—like Holocaust denial, that life in North Korea compares favorably to life in the Unites States, or that the Apollo 11 moon landing was faked—or overt racism." ECF No. 25 at 22. These issues are fundamentally different from the instant issue before the Court. But the Court rejects the District's argument that *Hazelwood* allows school boards to remove books to promote self-proclaimed conservative values. *See id.*

[12] Plaintiffs argue that, if *Pico* does not provide the proper framework, *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), would apply. ECF No. 9 at 22–23; ECF No. 28 at 7–8; see *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 435 n.11 (4th Cir. 2013) (in a free-speech clothing case brought by a student, the Fourth Circuit observed that, "we must continue to adhere to the *Tinker* test in cases that do not fall within any exceptions that the Supreme Court has created until the Court directs otherwise"). The District does not respond to this argument. The Court is not convinced that *Tinker* provides the correct framework, but the Court would find that Plaintiffs would prevail under this standard. *Tinker* provides that school "officials may not restrict speech based on 'undifferentiated fear or apprehension of disturbance' or a 'mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 37 (10th Cir. 2013) (quoting *Tinker*,

> *e. Whether the District's Book Removal Violated the Author Guild Plaintiffs' First Amendment Rights*

The District argues that the authors' viewpoint discrimination claims fail because the District's libraries are not a public forum for the authors' expression. ECF No. 25 at 27. Even if the Court treats the library as a nonpublic forum, the District's actions still violate the authors' First Amendment rights. "To be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum *must not be based on the speaker's viewpoint* and must otherwise be reasonable in light of the purpose of the property." *Arkansas Educ. Television Comm'n*, 523 U.S. at 682 (emphasis added). As discussed above, the Board's emails strongly suggest—if not expressly admit—that the exclusions were viewpoint-based. The authors have shown a likelihood of success on the merits of their First Amendment claim.

> *f. Standing to Challenge the Removal of* You Should See Me in a Crown, #Pride, *and* It's Your World—If You Don't Like It, Change It

The District argues that none of the Plaintiffs have standing to challenge the removals of *You Should See Me in a Crown, #Pride: Championing LGBTQ Rights*, or *It's Your World—If You Don't Like It, Change It* because these three works were only found in the middle school library, and none of the Plaintiffs attend Elizabeth Middle School.

---

393 U.S. at 508–09). Students' First Amendment rights cannot be abridged "unless the school reasonably forecasts it 'would materially and substantially interfere with the requirements of appropriate discipline in operation of the school,' or 'impinge upon the rights of other students.'" *Id.* (quoting *Tinker*, 393 U.S. at 505–06). Not only does the District point to no substantial disruption caused by the Removed Books, but it also removed the books based on the District's perceived "unpopular viewpoints" contained in the books.

ECF No. 25 at 11–12.[13] Plaintiffs argue that the NAACP has standing to sue on behalf of its members because the organization's members intend for their children to have access to the Removed Books. ECF No. 28 at 2–3. They also argue that, even if some NAACP members have moved their children to new schools following the policy changes, "the 'opportunity' to return [a student] to her home district, in addition to alleviating [] ongoing feelings of marginalization, is surely a 'tangible benefit' sufficient to confer standing." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 190 (4th Cir. 2018).

The Court finds that Plaintiffs have standing to challenge the removal of *You Should See Me in a Crown, #Pride: Championing LGBTQ Rights*, or *It's Your World—If You Don't Like It, Change It*. Although none of the Plaintiffs attend Elizabeth Middle School, the mother of Plaintiff E.S. intends for E.S. and his younger sister to attend Elizabeth Middle School, which is the only middle school in the District. ECF No. 9-3 (Smith Decl.), ¶¶ 3–5. And Portia Prescott, the local NAACP president, states that "[s]ome NAACP members removed their children from Elizabeth schools because of the District's decision to remove books from their school libraries." ECF No. 9-4, ¶ 9. She provided an example of one member, who had a fifth grader enrolled in Running Creek Elementary, who saw the removal of books as a manifestation of racism in the District, prompting her to unenroll her child from the elementary school. *Id.* If that fifth grader returns to the District, presumably it will be at the start of the next school year, at which point the student would be enrolled at Elizabeth Middle School as a sixth grader. Consistent with the Fourth

---

[13] The Court observes that, beyond disputing Plaintiff NAACP's standing to challenge these three Removed Books, the District does little to address the NAACP's claims in its response. Critically, it does not contest that the NAACP has standing to sue on behalf of its members.

Circuit's reasoning in *Deal*, the opportunity for students to return to their home district is a tangible benefit sufficient to confer standing.

* * *

It is clear and unequivocal to the Court that Plaintiffs have established a substantial likelihood of prevailing on their substantive claims at trial, and therefore, this factor weighs in favor injunctive relief.

### 2.   Irreparable Harm

"Irreparable harm" means that the claimed injury "must be both certain and great"; it is not enough to be "merely serious or substantial." *Prairie Band of Potawatomi Indians*, 253 F.3d at 1250 (citation omitted). Generally, a harm is not irreparable when the losses may be compensated by monetary damages. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). The movant must show that the "injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citation omitted) (emphasis in original); *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (showing irreparable harm is "not an easy burden to fulfill").

The "Supreme Court has instructed that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). Stated differently, where "First Amendment rights are violated, irreparable injury is presumed." *Bioganic Safety Brands, Inc. v. Ament*, 174 F. Supp. 2d 1168, 1182–83 (D. Colo. 2001) (citing *Utah Licensed Bev. Ass'n v. Leavitt,* 256 F.3d 1061, 1076 (10th

Cir. 2001)); *see also Awad v. Ziriax,* 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (citation and quotations omitted)).

Plaintiffs argue that the presumption of irreparable harm applies because their First Amendment rights are implicated. ECF No. 9 at 25. The District argues that Plaintiffs are not harmed "as each of the previously removed books is now available for them to read, browse, or check out in the library from which it was taken." ECF No. 25 at 28. The District also argues that Plaintiffs' delay in seeking a preliminary injunction implies a lack of irreparable harm. *Id.* at 29.

The Court finds that there is a presumption of sufficient irreparable injury to warrant preliminary injunctive relief, and it rejects the District's delay argument.

First, Plaintiffs' (the students', parents', NAACP members', and authors') First Amendment rights clearly are implicated, so the presumption applies. Second, the District's proposed remedy—to put the removed books back in the libraries and make them available *only* to Plaintiffs, NAACP members, and NAACP members' children—is no remedy at all. ECF No. 25 at 10 (on the same day the District filed its opposition brief, the District states that it "decided to place copies of each of the 19 titles that the School Board voted to remove in the library from which they were taken[, and t]hese titles are available only to C.C., E.S., or any student who is either a member of the NAACP [] or who has a parent or guardian who is a member of the NAACP"). As Plaintiffs point out, such compelled disclosure would be an improper restraint on Plaintiffs' freedom of association and could chill potential litigants. *See NAACP v. State of Ala. ex rel.*

*Patterson*, 357 U.S. 449, 462 (1958) ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association . . . ."). The Supreme Court "has recognized the vital relationship between freedom to associate and privacy in one's associations." *Id.* "To overcome the deterrent effect on associational rights resulting from compelled disclosure of membership lists, the government must demonstrate a *compelling* interest, and a substantial relationship between the material sought and legitimate governmental goals." *In re First Nat. Bank, Englewood, Colo.*, 701 F.2d 115, 117 (10th Cir. 1983) (citing *Patterson*, 357 U.S. at 461–64). The District has not attempted to make this showing.

There are other problems with the District's proposed remedy. To start, the District has made clear that the removal process is ongoing. ECF No. 9-14 at 2 (Superintendent Snowberger expressly stating that additional books may be "removed based on further discussion between members of the community and the Board of Education" anytime books are "brought to the attention of the district throughout the year by staff or parents"); ECF No. 26 (answer), ¶ 149 (admitting that book-removal process is ongoing). The District ignores this argument in its response.

More fundamentally, courts have held that a "[r]estraint on protected speech generally cannot be justified by the fact that there may be other times, places or circumstances for such expression." *Pratt v. Ind. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 779 (8th Cir. 1982). Thus, it "makes no difference for purposes of the First Amendment" that the "books in question have not been removed from the Library, but rather have simply been relocated . . . ." *Virden*, 2024 WL 4360495, at *4.

*Counts v. Cedarville School District* is instructive. 295 F. Supp. 2d 996 (W.D. Ark. 2003). There, all *Harry Potter* books were moved to an area of the school library that was inaccessible unless students had parental permission to check them out. *Id.* at 1001. In rejecting the school's justifications for relocating the books, the district court found it important that the plaintiff could not "simply go in the library, take the books off the shelf and thumb through them—perhaps to refresh her mind about a favorite passage—without going through the permission and check-out process is a restriction on her access. Thus, . . . such restrictions . . . amount to impermissible infringements of First Amendment rights." *Id.* at 1002. The District's proposed remedy fares no better.

The same analysis applies with greater force under the Colorado Constitution. *See Tattered Cover*, 44 P.3d at 1053–54. The Colorado Supreme Court has said that, "because our state constitution provides more expansive protection of speech rights than provided by the First Amendment, *it follows that the right to purchase books anonymously* is afforded even greater respect under our Colorado Constitution than under the United States Constitution." *Id.* at 1054 (emphasis added). The Court sees no reason why this protection would not apply to students' ability to check out books at a school library without disclosing their association with this lawsuit or the NAACP.

Finally, the District argues that Plaintiffs delayed longer than they should have in seeking this injunction. This argument has some merit, but given the considerations involved—parents and students had to weigh their constitutional rights against the consequences of suing the District, which could include public shaming and humiliation— the Court does not find the delay unreasonable. ECF No. 28 at 15 (citing various Plaintiff

declarations). This is not a run-of-the-mill business dispute; a brief glance at the District's internal correspondence shows that this is a politically charged issue. *See, e.g.*, ECF No. 9-9 (Board President discussing commitment to conservative values); ECF No. 9-12 (Board Director stating that LGBTQ literature "doesn't belong in any school" and the District's "constituents will not be happy about us returning any of these books"); ECF No. 9-13 (various book review forms from parents using strong language in opposition to ideas contained in certain Removed Books). Thus, such a delay in this situation does not signify a lack of injury.

* * *

Consistent with the above analysis, this factor, like the last, weighs in favor of injunctive relief.

### 3.    Balance of Hardships

"To be entitled to a preliminary injunction, the movant has the burden of showing that 'the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction." *Barrington v. United Airlines, Inc.*, 566 F. Supp. 3d 1102, 1113 (D. Colo. 2021) (quoting *Heideman*, 348 F.3d at 1190). As discussed above, when a government actor denies an individual a constitutional right or protection, the resulting injury is inherently serious. *See Elrod,* 427 U.S. at 373; *Verlo*, 820 F.3d 1127; 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.2 (3d ed.) ("[W]hen plaintiff is claiming the loss of a constitutional right, courts commonly rule that even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue.").

Quite the opposite, any injury to the District is minimal. The District contends that the District "would be forced to purchase, catalog, and re-shelve the removed titles," and that a preliminary injunction "would leave the District unable to make decisions regarding the curation of its school libraries until the end of this litigation." ECF No. 25 at 30. This argument fails.

The District has stated that "each of the previously removed books is now available for [Plaintiffs] to read, browse, or check out in the library from which it was taken." ECF No. 25 at 28. It is thus not clear that the District would be forced to purchase any books. And the alleged harm of having to catalog and re-shelves books is, quite frankly, absurd: librarians do this regularly each time a patron returns a book. Finally, it would be less burdensome *to the District* to return to Removed Books to the book shelves for students to peruse on their own time without any involvement from school librarians. Under the District's plan, a librarian must take several steps to ensure that a student is permitted to check out a Removed Book, such as verifying a student's affiliation to this lawsuit or verifying a student's parent's membership in the NAACP (which can change at any time).

Restoring the Removed Books to school library shelves will cause no injury to the District. *See Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 684 (D. Me. 1982) (Defendants failed to show that restoring *365 Days* to the school library pending decision on merits of Plaintiffs' First Amendment claims would cause them comparable injury to Plaintiffs). Even if it did, the Court finds that the District's concerns are outweighed by Plaintiffs' constitutional protections.

Plaintiffs have shown that the balance of harms favors granting their requested injunctive relief. Factor three weighs in Plaintiffs' favor.

### 4.    Public Interest

Finally, in considering whether Plaintiffs' requested injunctive relief is in the public interest, courts often find that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 237 F. Supp. 3d 1126, 1134–35 (D. Colo. 2017), *aff'd*, 916 F.3d 792 (10th Cir. 2019) (quoting *Connection Distrib., Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)); *Loc. Org. Comm., Denver Chapter, Million Man Mar. v. Cook*, 922 F. Supp. 1494, 1501 (D. Colo. 1996) ("[A]s far as the public interest is concerned, it is axiomatic that the preservation of First Amendment rights serves everyone's best interest."). So too here.

Accordingly, the Court finds that the fourth factor weighs in favor of Plaintiffs' injunctive relief.

## V.  CONCLUSION

For the reasons explained below, the Court DENIES Defendant's motion to exclude. ECF No. 27. And finding that Plaintiffs have satisfied the four prerequisites for a preliminary injunction, the Court GRANTS Plaintiffs' motion. ECF No. 9.[14] Pending a final

---

[14] This order does not call into question a school's "legitimate power to protect children from harm." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011). But as Justice Scalia explained, that power "does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* Nor does this order address the scope of a school district's discretion over certain curricular matters. *See Hazelwood*, 484 U.S. at 273; *but see Fleming*, 298 F.3d at 920 ("We conclude by noting that the *Hazelwood* analysis does not give schools unbridled discretion over school-sponsored speech. A number of constitutional restraints continue to operate on public schools' actions, such as the Establishment Clause, the Free Exercise Clause, the Equal Protection Clause, and substantive due process."). The Court merely finds that school library books are not part of the mandatory curriculum—even when applying a broad definition of school curriculum. *Fleming*, 298 F.3d at 920 (warning against defining "school curriculum" activities too narrowly). As Plaintiffs rightly point out, no student is required to read every book in the library, ECF No. 9 at 15. and

trial on Plaintiffs' request for a permanent injunction or other resolution, the Court orders the District to return the Removed Books to their respective libraries no later than March 25, 2025, and the District is enjoined from removing additional books because the District disagrees with the views expressed therein or merely to further their preferred political or religious orthodoxy.[15]

DATED this 19th day of March 2025.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge

---

as the District acknowledges, eight of the 19 Removed Books have never been checked out, ECF No. 25 at 10, which plainly shows that those books are not part of any curriculum.

[15] Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Plaintiffs argue that a security is not necessary here because the District will not suffer any undue harm if the Court grants Plaintiffs' motion. ECF No. 9 at 29. The District offers no response and therefore concedes that security is unwarranted in this instance. Accordingly, the Court will not require Plaintiffs to post security.